IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE, WESTERN DIVISION

| | |
|---|---|
| H&R BLOCK<br>EASTERN TAX SERVICES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PHILLIP MURPHY,<br>MARY E. MURPHY,<br>PHILLIP MURPHY, JR., and<br>MURPHY TAX ASSOCIATES, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 03 - 2763   Ma P

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION, AND OTHER RELIEF

Plaintiff, H&R Block Eastern Tax Services, Inc. ("H&R Block"), states:

## INTRODUCTION

1.     H&R Block seeks a Temporary Restraining Order, Preliminary and Permanent Injunctions, and other relief against Phillip Murphy, Mary E. Murphy, Phillip Murphy, Jr., and Murphy Tax Associates LLC ("Defendants") for trademark infringement; misappropriation of H&R Block's trade secrets; actual and threatened violations of the Franchise Agreement, the Electronic Filing Agreement, and the Financial Products Licensing Agreement; unfair competition, and tortious interference with H&R Block's business and business relationships. H&R Block also seeks to enforce the terms and conditions of the restrictive covenants set forth in the Agreements, and to enjoin future tortuous conduct by Defendants.

## PARTIES AND JURISDICTION

2.      H&R Block, is a Missouri corporation with its principal place of business in Kansas City, Missouri.  H&R Block is engaged in, among other things, the business of preparing and electronically transmitting state and federal income tax returns for its clients and customers.   H&R Block has offices throughout the country, including Collierville, Shelby County, Tennessee.

3.      Defendant, Phillip Murphy ("Murphy"), is a former owner of an H&R Block franchise in Collierville.  Upon information and belief, he is a resident of the State of Tennessee, and resides at 1290 Highway 196, Collierville, Tennessee, 38017.

4.      Defendant, Mary E. Murphy, is a former licensee of H&R Block and former office manager, business manager, and authorized representative of the Collierville H&R Block franchise.  Upon information and belief, she is a resident of the State of Tennessee, and resides at 1290 Highway 196, Collierville, Tennessee, 38017.

5.      Defendant, Phillip Murphy, Jr., upon information and belief, is a resident of the State of Tennessee and maintains a business at 358 New Byhalia Road, Collierville, Tennessee, 38017.

6.      Defendant Murphy Tax Associates, LLC is a Tennessee limited liability company, whose business address is 358 New Byhalia Road, Collierville, Tennessee, 38017.

7.      The Court has original subject matter jurisdiction over H&R Block's federal trademark claims under 5 U.S.C. § 1125 pursuant to 28 U.S.C. § 1331. The court has original subject matter jurisdiction over H&R Block's related unfair competition

claims pursuant to 28 U.S.C. § 1338(b).  The Court has supplemental jurisdiction over

H&R Block's remaining state law claims pursuant to 28 U.S.C. § 1367(a).

8.      The also has original jurisdiction over the entire controversy pursuant to

28 U.S.C. § 1332.

**FACTS AND ALLEGATIONS**

**Defendants' Relationship with Block**

9.      H & R Block has the exclusive right to use the registered trademark

"Executive Tax Service." A copy of the United States Patent Office registration and

renewal documents for this mark are attached hereto as **Exhibit A** and incorporated

herein by reference.

10.     On November 30, 1984, Phillip Murphy ("Murphy"), entered into a

franchise agreement with H&R Block ("the Franchise Agreement") to operate an H&R

Block tax preparation service in Collierville.  A copy of the Franchise Agreement is

attached hereto as **Exhibit B** and is incorporated herein by reference.  The franchise

territory was defined as the city of Collierville, in the County of Shelby and State of

Tennessee.  Under the Franchise Agreement, Murphy was given the exclusive right to

operate an income tax return preparation service using H&R Block's "Licensed Marks."

Under the Franchise Agreement, Murphy was to pay H&R Block a royalty income

received from services performed in and by the Collierville H&R Block office.

11.     On November 19, 1999, Murphy entered into an Electronic Filing

Agreement with H&R Block allowing Murphy to electronically file tax returns on behalf

of and through H&R Block.  A copy of the Electronic Filing Agreement is attached

hereto as **Exhibit C** and is incorporated herein by reference.

12.     On December 3, 1999, Mary Murphy signed a Financial Products Licensing Agreement ("FPLA"), which allowed her to sell, market, and deliver financial products under H&R Block's licensed marks.  Mary Murphy signed the FPLA as a representative of the Collierville H&R Block franchise owned and operated by Murphy. A copy of the FPLA is attached hereto as **Exhibit D** and is incorporated herein by reference.  Exhibits B, C, and D are referred to collectively herein as "the Agreements."

13.     Mary Murphy was at all times relevant to these events, actively involved in the ongoing business of the Collierville H&R Block franchise. Murphy designated Mary Murphy as the office manager on his initial franchise application and she served in that capacity.  Mary Murphy also acted as an authorized representative of the Collierville H&R Block franchise, as evidenced by the FPLA. Murphy also functioned as the business manager of the Collierville H&R Block franchise, as evidenced by royalty checks signed by Mary Murphy on behalf of the Collierville H&R Block franchise dated as late as February 2003. Mary Murphy also prepared tax returns for the Collierville H&R Block franchise.

14.     Murphy failed to have Mary Murphy execute an Employment Contract and non-competition agreement as required by the Franchise Agreement.

15.     Phillip Murphy, Jr., is the son of Phillip Murphy and Mary Murphy.

**Agreement Provisions**

16.     Section 10 of the Franchise Agreement enumerated the required conduct of Murphy's business.  Specifically, it states that Murphy may not conduct any business or activities from the H&R Block office or allow any other person to conduct any

4

activities from the H&R office other than those permitted or required under the Franchise Agreement.

17.     The Franchise Agreement states that H&R Block office space may be subleased in only two circumstances: 1) to third parties, during the off-season, for the purpose of conducting activities of the type that there will be no implication that such activities are being performed under the licensed marks; or 2) the office space is separately identified from the office required to be maintained.

18.     Under the terms of the Franchise Agreement, Murphy also specifically agreed: (a) during the term of the Franchise he would not compete, directly or indirectly whether as an owner, stockholder, partner, officer, director, or employee, with H&R Block or any H&R Block franchisees in the business of preparing tax returns or performing related services in or within 45 miles of the Franchise territory; in the franchise territory granted to any other franchisee; or within 45 miles of any office operated by Block; (b) for a period of one year after the termination of the Franchise Agreement or the transfer or other disposition of the franchise, he will not directly or indirectly whether as an owner, stockholder, partner, officer, director, or employee, solicit by mail, phone or in person, or divert from H&R Block or any H&R Block franchisees any person for whom he prepared a tax return or related service at any time during the Franchise Agreement's term for the purpose of rendering services in connection with the preparation of tax returns or performance of any related services; and (c) for a period of one year after termination of the Franchise Agreement or the transfer or other disposition of the franchise, he will not compete directly or indirectly whether as an owner, stockholder, partner, officer, director, or employee, with H&R Block or H&R

Block franchisees in the business of preparing tax returns or performing related services in or within 45 miles of the franchise territory.

19.     The Franchise Agreement also required Murphy to maintain for a period of at least three full years, complete and accurate books and records pertaining to tax return preparation and, for the purpose of determining compliance with the terms of the agreement copies of all customer receipts, customer tax returns, bank statements, full complete and accurate books and records of accounts, and Franchisee's tax returns. All of these books and records were required to be open to inspection by H&R Block during regular business hours.

20.     Upon termination of the Franchise Agreement, paragraph 14 requires Murphy to "immediately refrain from using, by advertising or otherwise, directly of indirectly any of the Licenses marks," and "refrain from using any words or combinations of words similar or suggestive in any way of the licensed marks, and any trade names, trademarks, [etc.] of the Block."

21.     Upon termination of the Franchise Agreement, Murphy was also required by paragraph 14 to "assign whatever, right, title or interest [Murphy] may have in and to [the] business, telephone numbers and telephone business directory listings."

22.     Upon termination of the Franchise Agreement, paragraph 14 of the Franchise Agreement requires Murphy to "immediately return to Block … copies of all customer tax returns, … customer lists, customer names, forms, files and computer storage materials.

23.     Murphy further covenanted that he would never (a) divulge to or use for the benefit of any person, association or corporation outside of the H&R Block

6

organization, any information or knowledge concerning customers, the methods, promotion, advertising or any other systems or methods of operation of H&R Block's business or that of H&R Block's franchisees which Murphy may have acquired by virtue of the Franchise Agreement; (b) or do any deliberate act prejudicial or injurious to the goodwill or name of H&R Block.

24.     The FPLA, signed by Mary Murphy on December 3, 1999, provides that upon its termination the Licensee, Mary Murphy, shall surrender all customer files to H&R Block.  The FPLA also provides that the licensee will not compete directly or indirectly whether as an owner, stockholder, partner, officer, director, or employee, with H&R Block in the business of selling Financial Products in or within 45 miles of the Franchise Territory (Collierville), in the territory granted to any other H&R Block licensee, or within 45 miles of any Financial Products office operated by H&R Block for a period of two (2) years after termination of the agreement.  Additionally, the FPLA provides that for a period of two (2) years after the termination of the agreement, the licensee will not directly or indirectly whether as an owner, stockholder, partner, officer, director, or employee, solicit by mail, phone or in person, or divert from H&R Block or H&R Block franchisees any person to whom Financial Products were offered at anytime during the term of the agreement or compete with H&R Block in the business of selling Financial Products in or within 45 miles of the Franchise Territory.

**Trademark Infringement, Breach of Agreements, Unfair Competition, and Interference with H&R Block's Business**

25.     During the term of the Franchise Agreement Murphy and, Mary Murphy received considerable and specialized training from H&R Block regarding H&R Block's policies, procedures, and tax and related business operations.  Defendants also had access

7

to confidential business information and trade secret information of H&R Block, including customer tax information, client lists, client names, addresses, telephone numbers, and proprietary tax return and financial information.

26.    Throughout the nineteen (19) years that Murphy held the H&R Block Collierville franchise, Murphy and Mary Murphy developed and maintained considerable and ongoing business contacts with H&R Block clients for whom tax returns were prepared and/or electronically transmitted or for whom other services were provided. These client contacts resulted in continued and ongoing business and good will for H&R Block.

27.    These clients repeatedly returned to H&R Block to have their taxes prepared or electronically transmitted during the tax season and to consult with H&R Block for general tax advice and services throughout the year. Furthermore, H&R Block has invested considerable time, money, and other valuable resources in formulating, compiling, and protecting its confidential business and trade secret information. As a result, H&R Block has a protectable interest in its confidential information, trade secrets, goodwill, client contacts, files and records, and other professional customer relationships.

28.    Problems began to arise with Murphy's Collierville H&R Block franchise in or about September 2000. Murphy discontinued using the required software provider for the H&R Block Electronic Filing System ("EFS"). As a result of this breach, H&R Block terminated the FPLA on December 18, 2000. Mary Murphy was thus prohibited from, among other things, competing with H&R Block in the selling of any Financial Products, as provided for under the FPLA, until December 18, 2002. The Franchise Agreement, however, remained in place at this time.

8

29.     In May 2002, H&R Block discovered that several tax returns prepared and filed from the Collierville H&R Block location were not properly accounted for. On May 23, 2002, H&R Block sent Murphy a letter detailing numerous breaches of the Franchise Agreement. These breaches included Murphy's failure to enter returns into H&R Block's Tax Tracking System ("TT"), and allowing unauthorized individuals, including but not limited to Phillip Murphy Jr., to operate and prepare tax returns using H&R Block's system and name without accounting for the returns or profits to H&R Block. This was work that otherwise would have and should have been performed on behalf of H&R Block.

30.     Defendants were, in fact, diverting business away from H&R Block to themselves (individually), their family and friends. Defendants, however, were using H&R Block's system and filing licenses to conduct this competitive activity.

31.     After repeated demands, Murphy failed to provide any information to H&R Block concerning the returns prepared in competition with H&R Block. In October 2002, H&R Block again requested information on the individuals who used and received H&R Block services, but were not entered into TT. Murphy assured H&R Block that all returns would be entered and that no further competitive activity would take place at the Collierville H&R Block location or using H&R Block's systems.

32.     In early 2003, H&R Block discovered that Murphy was still operating in direct competition with H&R Block. In the same offices, under the H&R Block signage and licensed marks, Mary Murphy, Phillip Murphy, and Phillip Murphy, Jr. and Murphy Tax Associates, LLC were operating in direct competition with H&R Block using the names "Executive Tax Services" and "Murphy Tax Services." Executive Tax Service is

a licensed mark of H&R Block. A copy of ads and a prepared tax returned using and infringing upon H&R Block's licensed trademark are attached as **Exhbit E**. H&R Block has never authorized Defendants, individually or in concert, to use its licensed and registered trademark for these purposes.

33.     The offices of the Collierville H&R Block office and Murphy Executive Tax Services were so intertwined that persons had to actually enter the H&R Block office to gain access to the Murphy Executive Tax Service "office" upstairs. The addresses for the Collierville H&R Block office and Murphy Tax Service are listed as the same address in the telephone directory -- 358 New Byhalia Road. There was no signage indicating that a business other than H&R Block was located on the premises.

34.     On March 6, 2003, Murphy directed a potential tax preparation customer who contacted him by telephone to Mary Murphy, Murphy Tax Service, and Executive Tax Service.

35.     On or about March 12, 2003, a call placed to the telephone number listed in the Murphy Tax Service ad was answered "H&R Block."

36.     On or about March 14, 2003, Murphy directed a potential tax preparation customer, who came to the H&R Block office, upstairs to Philip Murphy, Jr. and Murphy Tax Service, who prepared the return for the client. H&R Block did not receive any of the money paid to Phillip Murphy, Jr. or any royalties on this work.

37.     As a result of the above and other breaches, H&R Block terminated the Franchise Agreement in April 2003.

38.     Murphy has refused to disconnect or assign the H&R Block telephone number to H&R Block. Moreover, the H& R Block telephone number in Collierville is being answered as Murphy Tax Services as recent as October 10, 2003.

39.     The Internal Revenue Service's e-file provider listings has identical contact information, addresses, and telephone numbers for H&R Block, Mary Ellen Murphy, and Murphy Tax Associates LLC. A copy is attached as **Exhibit F**.

40.     Defendants have wrongful retained and/or misappropriated all of H&R Block's previously client returns, records, and files from the H&R Block Collierville office. Based upon previously reported activity, H&R Block estimates this to be over 2,200 files.

41.     Defendant's retention of these files in contravention of  contractual obligations amounts to misappropriation of H&R Block's trade secrets, unfair competition, and intentional interference with H&R Block's business.  The information contained in these files is vital to H&R Block's ability to continue to service its client base in the Collierville area.  Copies of client's tax returns, loan information, financial information, and information necessary for the preparation of 2003 and future tax year tax returns are contained in the files wrongfully retained or misappropriated by Defendants.

42.     Upon information and belief, Defendants have acted together to breach the terms of the Agreements.  Defendants have endeavored to trade upon the value, goodwill, and national advertising efforts of H&R Block, a valuable property right of H&R Block, in violation of the terms of the Agreements.

43.   Upon information and belief, Defendants have been preparing and servicing clients in competition with H&R Block in violation of their Agreements and obligations since 2000 or earlier.

44.   Upon information and belief, Defendants solicited, directly or indirectly, clients and customers away from H&R Block for their own personal economic benefit and to the detriment of H&R Block.

45.   Upon information and belief, Defendants have removed, misappropriated, or used H&R Block's confidential business information, including but not limited to customer and client lists, customer names, addresses and related contact and tax information, for their own economic benefit in direct violation of their Agreements.

46.   Upon information and belief, Defendants have continued to violate the Agreements by preparing or electronically transmitting tax returns, or soliciting, diverting, or taking away clients from H&R Block after the termination of the Agreements.

47.   Upon information and belief, Defendants current and past use of H&R Block's registered trademark, Executive Tax Services, is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or as to the origin, sponsorship, or approval of Defendants' commercial activities.

48.   Defendants have refused to agree that they will not continue to wrongfully prepare, or electronically transmit tax returns, or solicit, divert, or take away H&R Block's clients in violation of the Agreements. Defendants will continue to do so unless and until they are immediately enjoined from doing so. Defendants' continued wrongful activities have resulted in and will continue to cause a substantial loss of business,

goodwill, client contacts, relationships, and confidential or trade secret information for H&R Block, now and in the foreseeable future.

49.     As a result of Defendants failure to return H&R Block's client files, H&R Block is unable to service those clients who contact H&R Block for services, copies of returns, or making payment. H&R Block is unable to determine which H&R Block clients have outstanding loan balances against refunds, have returns prepared but unfilled while awaiting payment, or have supplemental, amended, or extended returns due.

50.     By retaining and refusing to return H&R Block's clients files and records, Defendants have an unfair competitive advantage and those clients must contact Defendants rather than H&R Block for their information. The retention of this and other information has prompted many customers to leave H&R Block and use the services of Defendants. Additionally, H&R Block has had to order duplicate tax returns for several customers directly from the Internal Revenue Service at a cost, creating significant inconvenience for its customers.

51.     H&R Block will suffer severe and irreparable injury unless Defendants are restrained from performing the acts condemned and prohibited under the Agreements and trademark infringement laws.

52.     H&R Block does not have an adequate remedy at law.

## COUNT I
## REQUEST FOR TEMPORARY RESTRAINING ORDER, AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

53.     H&R Block incorporates by reference each of the allegations set forth in paragraphs 1 through 52 as though fully set forth herein.

54.     Upon information and belief, Murphy has solicited, diverted, or taken away, and intends to continue soliciting, diverting, or taking away H&R Block clients, and providing tax- and financial-related services to H&R Block's clients in violation of his ongoing contractual obligations to H&R Block.

55.     Murphy is in possession of, has utilized, and is in a position to continue to utilize H&R Block's confidential business information and trade secret information, including employee and customer tax information, client lists, client names, addresses, telephone numbers, and proprietary tax return and financial information, to his personal financial benefit and to the disadvantage of H&R Block.

56.     Murphy understood and acknowledged that if he breached the Franchise Agreement H&R Block would be entitled to injunctive relief and damages as set out in the Agreement.

57.     Unless Murphy is restrained from soliciting, diverting, or taking away H&R Block clients in violation of the Agreements, H&R Block will suffer immediate, permanent, and irreparable damage in that Murphy will misappropriate H&R Block's client relationships, client contacts, goodwill, and confidential and trade secret information, for his own improper use and benefit, and in direct violation of his obligations under the Agreement.

58.     There is no adequate remedy at law for such breaches, and injunctive relief is appropriate because complete monetary damages would be difficult to calculate if Murphy is permitted to continue to solicit, divert or take away H&R Block's clients.

59.     The confidentiality, extent of services, nonsolicitation, and noncompetition provisions in the Franchise Agreement are reasonable and valid in that

14

they afford reasonable protection to H&R Block's confidential and trade secret information, client contacts, client relationships, and goodwill and do not unreasonably restrain Murphy's ability to perform his trade.

60.     Murphy, Mary Murphy and Phillip Murphy Jr., have utilized and continue to utilize a registered trademark of H&R Block, "Executive Tax Services." Their commercial use of this registered trademark has caused and upon information and belief continues to cause a dilution of the distinctive quality of the mark.

61.     Unless the Defendants are restrained from utilizing H&R Block's registered trademark in their commercial endeavors, H&R Block will suffer immediate, permanent, and irreparable damage in that the continued use will further dilute the distinctive quality of the mark, and create a very strong risk of confusion among H&R Block's current and potential customer base.

62.     There is no adequate remedy at law for such trademark infringement, and injunctive relief is appropriate because complete monetary damages would be difficult to calculate if Defendants are permitted to continue to use H&R Block's registered trademark.

63.     The Defendants are currently using the phone number under which H&R Block is listed in the telephone directory and yellow pages. The use of this number increases the likelihood of confusion and enhances the Defendants' ability to divert business away from H&R Block.

## COUNT II
## TRADEMARK INFRINGEMENT

64.     H&R Block incorporates by reference each of the allegations set forth in paragraphs 1 through 63 as though fully set forth herein.

65.     H&R Block has marketed, advertised, and promoted H&R Block's tax services under its trademarks, service mark, and logos, and as a result of this marketing, advertising, and promotion, H&R Block and the H&R Block trademarks and service mark set forth above have come to mean and are understood to signify the tax, services, and marks of H&R Block, and are the means by which these services and marks are distinguished from those of others in the same and in related fields.

66.     Because of the long, continuous, and exclusive use of the trademarks described in this Complaint, H&R Block's registered marks have acquired a secondary meaning associated by customers, and the public with H&R Block.

67.     Defendants' activities constitute wrongful and unauthorized use in Tennessee and in interstate commerce of H&R Block's registered trademark.   Such activities are likely to cause confusion, mistake, or deception as to the source, origin, or approval of the infringing tax services and/or products being offered and distributed by Defendants which bear any counterfeit or infringing versions of the registered trademarks described in this Complaint.

68.     Further, the activities of Defendants are intended to, and are likely to, lead the public to conclude incorrectly that the tax services being offered or marketed by Defendants which bear any infringing versions of the registered trademarks described in this Complaint, which are or have been offered, advertised, and marketed by Defendants

originate with, are sponsored by, or are authorized by H&R Block, to the damage and harm of H&R Block, its licensees, and the public. Defendants' activities constitute willful and deliberate infringement of H&R Block's federally registered trademark in violation of the Lanham Trademark Act including, but not limited to, 15 U.S.C. § 1114(1).

69.     As a result of the foregoing, H&R Block has been damaged in an amount that will be ascertained according to proof. In addition to H&R Block's actual damages, H&R Block is entitled to receive Defendants' profits pursuant to 15 U.S.C. § 1117(a). These actual damages and profits should be trebled pursuant to 15 U.S.C. § 1117(b) because Defendants' violation of H&R Block's trademark was willful. In the alternative, H&R Block is entitled to statutory damages pursuant to 15 U.S.C. § 1117(c), and these statutory damages should be enhanced in accordance with 15 U.S.C. § 1117(c)(2) because Defendants' violation of H&R Block's trademarks was willful.

70.     The activities of Defendants have caused and will cause irreparable harm to H&R Block for which H&R Block has no adequate remedy at law in that (i) if Defendants' wrongful conduct continues, consumers are likely to become further confused as to the source of the tax services and/or products bearing any of the registered trademarks described in this Complaint; (ii) H&R Block's trademark is unique and valuable property which has no readily determinable market value; (iii) the infringement by Defendants constitutes an interference with H&R Block's goodwill and customer relationships; and (iv) Defendants' wrongful conduct, and the damages resulting to H&R Block, are continuing. Accordingly, H&R Block is entitled to injunctive relief, pursuant to 15 U.S.C. § 1116(a), and to an order under 15 U.S.C. § 1116, subsections (a) and

(d)(l)(A), and 28 U.S.C. § 1651 impounding all marketing materials, products and service materials being offered or distributed by Defendants which bear any infringing versions of the registered trademarks described in this Complaint.

71.     H&R Block is informed and believes, and on that basis alleges, that Defendants have committed the acts alleged above with previous knowledge of H&R Block's prior use and superior rights to the registered trademarks, trade names and service mark, and with previous knowledge of the reputation of H&R Block' registered trademark in interstate commerce.   Further, H&R Block is informed and believes that Defendants' actions were undertaken for the willful and calculated purpose of trading upon H&R Block's goodwill and for the willful and calculated purpose of marketing products and services based upon the goodwill of H&R Block's trademarks and trade names, and business reputation, so as to mislead and deceive customers and the public. Defendants' actions are likely to cause confusion and mistake among customers and the public as to the origin or association of the services and products being offered, all to Defendants' gain and H&R Block's damage.

72.     H&R Block is also entitled to recover its attorneys' fees and costs of suit pursuant to 15 U.S.C. § 1117.

## COUNT III
## BREACH OF CONTRACT

73.     The facts alleged herein constitute breach of the Agreements by Murphy.

74.     The facts alleged herein constitute breach of the FPLA by Murphy and Mary Murphy.

75.     The facts alleged herein constitute a conspiracy by Defendants to breach

the Agreements and harm H&R Block.

76.    As a result of Defendants' actions, individually and in concert, H&R

Block has been damaged.

### COUNT IV
### UNFAIR COMPETITION

77.    The facts alleged herein constitute unfair competition.

78.    The action of Defendants in retaining and misappropriating H&R Block's

client records, trademarks, and telephone number give them an unlawful and unfair

competitive advantage in the marketplace.

79.    As a result of the Defendant's actions, individually and in concert, H&R

Block has been damaged.

### COUNT V
### BREACH OF DUTY OF LOYALTY

80.    The facts alleged herein constitute a breach of Mary Murphy's duty of

loyalty as an employer, agent and representative of the Collierville H&R Block franchise.

81.    H&R Block is a third-party beneficiary to Mary Murphy's duties to the

franchise.

82.    Under the Agreements, Murphy paid royalties to H&R Block based on the

review generated.

83.    Mary Murphy's actions alleged herein damaged the profit and reserve of

the franchise and, thereby, damaged H&R Block.

### COUNT VII
### INTENTIONAL INTERFERENCE WITH BUSINESS

84.    The acts of Defendants alleged herein were done with the intent to injure

H&R Block's business and business relationships.

85.     The acts of Defendants alleged herein have wrongfully and unlawfully interfered with H&R Block's business and business relationships.

86.     As a result of the Defendants' actions, individually and in concert, H&R Block has been damaged.

## COUNT VII
## MISAPPROPRIATION OF H&R BLOCK'S TRADE SECRETS

87.     H&R Block maintains proprietary and confidential business information, including, but not limited to: client and business lists, training materials, software programs, computer disks, client and service files, documents, appointment books, and other items containing proprietary information such as names, addresses, telephone numbers, tax returns or tax return information regarding current and former clients of H&R Block. This information constitutes protectable trade secrets according to Tennessee's Trade Secrets Act, T.C.A. §§ 47-25-1701 through 1709.

88.     Defendants have misappropriated, and threaten to continue to misappropriate, confidential information and/or trade secrets, including but not limited to: H&R Block client information, client files, and other confidential business information that contains employee information and client names, addresses, telephone numbers, and tax return information, all of which were provided or made available to Murphy as a direct result of his Franchise Agreement.

89.     H&R Block has made reasonable efforts to maintain the secrecy and protect the confidentiality of this confidential business information and/or trade secrets and derives economic value from the continued secrecy and confidentiality of this information.

20

90.    Murphy has divulged this confidential and/or trade secret information to Murphy Tax Associates LLC, Mary Murphy and Phillip Murphy Jr. for their collective benefit to the detriment of H&R Block.

91.    Defendants' misappropriation, unauthorized disclosure, and misuse of H&R Block's confidential information and/or trade secrets is malicious, willful, wanton, and done with full knowledge and intent to injure H&R Block in its trade or business.

92.    As a direct and proximate result of Defendants' misappropriation and misuse of H&R Block's trade secrets, H&R Block has been damaged.

## COUNT VIII
## VIOLATION OF TENNESSEE UNFAIR TRADE PRACTICES ACT

93.    The acts, practices and conduct of Defendants as alleged above in this Complaint are likely to cause confusion or misunderstanding as to the source, sponsorship, approval or certification of the items Defendants distribute and constitute unfair methods of competition and deceptive acts and practices in violation of the Tennessee Unfair or Deceptive Acts or Practices Act, TENN CODE ANN. § 47-18-104.

94.    Defendants' acts, practices and conduct as alleged above have and are likely to continue to damage H&R Block and its goodwill and reputation.

95.    Defendants have willfully engaged in deceptive trade practices.

## COUNT IX
## IMPLEMENTATION OF A CONSTRUCTIVE TRUST

96.    By virtue of their wrongful acts alleged herein, Defendants hold profits as constructive trustees for the benefit of H&R Block.

97.    H&R Block is not presently aware of where the Defendants may have deposited all of their illegal profits from Defendants' wrongful acts against H&R Block

21

and the public. H&R Block believes that Defendants' illegal profits, whether in the form of bank accounts or in the form of real or personal property, will eventually be traced. H&R Block therefore believes that Defendants hold such illegal profits as constructive trustees for the benefit of H&R Block.

## COUNT X
## REQUEST FOR AN ACCOUNTING

98.     H&R Block is entitled pursuant to 17 U.S.C. § 504 and 15 U.S.C. § 1117 to recover any profits of Defendants that are attributable to their acts of infringement.

99.     H&R Block is entitled pursuant to 17 U.S.C. § 504 and 15 U.S.C. § 1117 to actual damages or statutory damages sustained by virtue of Defendants' acts of infringement.

100.    The amount of money due from Defendants to H&R Block is unknown to H&R Block and cannot be ascertained without an accounting of the advertising, marketing, solicitation of services, and actual client serviced, by Defendants.

101.    H&R Block is entitled under federal and state law to an accounting of all profits and the services of Defendants' revenue from January 1, 2000 to the date of the accounting.

## PRAYER FOR RELIEF

**WHEREFORE**, in light of the actual conduct, and real apprehension of continued conduct of Defendants as alleged herein, H&R Block prays that this Court grant the following relief:

a. Issue a Temporary Restraining Order, a Preliminary Injunction, and a Permanent Injunction enjoining Murphy, Mary Murphy, Phillip Murphy Jr., and Murphy Tax

Service, LLC from utilizing the registered trademark of H&R Block, "Executive Tax Service" or similar marks.

b.     Issue a Temporary Restraining Order, a Preliminary Injunction, and a Permanent Injunction requiring Defendants to maintain all records and files of H&R Block in their current state and prohibiting the destruction of any of those files, returns, materials, and records in the possession of Defendants.

c.     Issue a Temporary Restraining Order, a Preliminary Injunction, and a Permanent Injunction requiring Defendants disconnect and to cease and desist from the use of the former Collierville H&R Block telephone number (901) 853-9076.

d.     Issue a Preliminary and Permanent Injunction enjoining Defendants and all persons acting through, or on behalf them for a period of one (1) year from directly or indirectly preparing or electronically transmitting tax returns, or providing any products or services that H&R Block offers within 45 miles of its Collierville, Tennessee, office.

e.     Issue a Preliminary and Permanent Injunction enjoining Defendants and all persons acting through, or on behalf of them, for a period of one (1) year from directly or indirectly soliciting, diverting, or taking away any past or present clients of H&R Block's Collierville, Tennessee office.

f.     Issue a Preliminary and Permanent Injunction enjoining Defendants and all persons acting through, or on behalf of them from directly or indirectly using, divulging, disclosing, or otherwise misappropriating any of H&R Block's confidential business information, client information and/or trade secrets.

g.     Issue an Order compelling Defendants to disclose to H&R Block the identities of every past or present person or entity whose return them, and all persons acting through, or on behalf of them, prepared or electronically filed during or after the Franchise Agreement was in effect that has not been accounted to H&R Block.

h.     Issue an Order compelling Defendants to return to H&R Block all of the client and other business lists, computer disks, files, appointment books, documents or other items containing names, addresses, telephone numbers, tax information, returns, loan documents, financial information, or information relating in any way to H&R Block's current, former, or prospective clients.

i.     Issue an Order compelling Defendants to provide an accounting of all profits from their commercial endeavors and the services of all revenues since January 1, 2000, and award H&R Block damages in excess of $75,000.

j.     Award H&R Block actual or statutory damages under the Lanham Act.

k.     Award H&R Block its expenses and reasonable attorney fees and such other and further relief to which it is entitled.

## **VERIFICATION**

I, John Greenway, am employed by H&R Block in the position

of _Vic Prilat_. I have read the foregoing factual allegations of this Complaint

and they are true based upon my own personal knowledge and information gathered and

provided to me by persons acting at and under by direction and control.

_John Greenway_

County of _Gwinnett_,

State of _GA_,

Sworn to and Subscribed before me this _13_ day of October 2003.

_Robin M. Wheeler_

Notary Public

Robin M. Wheeler
Notary Public, Gwinnett County, Georgia
My Commission Expires May 26, 2005

24

Respectfully Submitted,

Steven W. Likens (13311)
Husch & Eppenberger, LLC
200 Jefferson, Suite 1450
Memphis, TN 38103
(901) 523-1123

Attorneys for H&R Block

**THIS IS THE FIRST APPLICATION FOR EXTRAORDINARY RELEIF SOUGHT IN THIS MATTER.**

## FIAT

To the Clerk:

Enter the Following Temporary Restraining Order and set a hearing on Plaintiff's application for a Preliminary Injunction on or before October 30, 2003.

### Temporary Restraining Order

Phillip Murphy, Mary E. Murphy, Phillip Murphy, Jr., and Murphy Tax Associates, LLC, their officers, agents, servants, employees, attorneys, and all those persons acting in concert with them are hereby restrained, until further order of the Court:

        a.     from using in any manner "Executive Tax Service" or "Executive Tax Services" for any commercial purpose or in any advertisement, signage, promotional, or other material;

        b.     from destroying, transferring or removing from Shelby County, Tennessee, any file, tax return, loan document, material, client list, or other document, in tangible or electronically stored format, of persons or entities on whose behalf, individually or in concert, they prepaid returns, filed returns, or performed services as a franchisee, employee, or representative of H&R Block or any H&R Block franchise; and

        c.     from using telephone number (901) 853-9076, and they are further ordered to have that telephone number disconnected or assigned to H&R  Block.

The Court finds that Plaintiff will suffer irreparable harm and there will be no adequate remedy at should this restraining order not issue.

 

 

                                 _____

                                   JUDGE _____

                                   Date:_____



The United States of America

# CERTIFICATE OF RENEWAL

## Reg. No. __836,459__

Application to renew the above identified registration having been duly filed in the Patent and Trademark Office and there having been compliance with the requirements of the law and with the regulations prescribed by the Commissioner of Patents and Trademarks,

This is to certify that said registration has been renewed in accordance with the Trademark Act of 1946 to    H & R Block, Inc., of Kansas City, Missouri, A Missouri Corporation

and said registration will remain in force for twenty years from  October 3, 1987 unless sooner terminated as provided by law.



In Testimony Whereof I have hereunto set my hand and caused the seal of the Patent and Trademark Office to be affixed this fifth day of April, 1988.

*Donald J. Quigg*

Commissioner of Patents and Trademarks

PTO - 134  (Rev. 5 - 83)

EXHIBIT
A

# United States Patent Office

**836,459**
Registered Oct. 3, 1967

## PRINCIPAL REGISTER
### Service Mark

Ser. No. 251,817, filed Aug. 5, 1966

# EXECUTIVE

H & R Block, Inc. (Missouri corporation)
4410 Main St.
Kansas City, Mo.

For: PREPARATION OF INCOME TAX RETURNS
FOR OTHERS, in CLASS 101.
First use on or about Jan. 15, 1966; in commerce on or
about Jan. 15, 1966.

COMB. AFF. SEC 8 & 15
11-9-72
35

Section Code  99848

## SATELLITE FRANCHISE AGREEMENT

THIS AGREEMENT is made and entered into this _30_ day of _Nov_, 19_84_ between H&R BLOCK

(_____), INC., a _Missouri_ corporation ("Block"), and

_Phillip A. Murphy_
(Name)

_110 Mulberry St., Collierville, Tn. 38017_
(Address)

("Franchisee").

In consideration of the covenants and agreements set forth below, Block and Franchisee agree as follows:

**1. Definitions.**

As used in this Agreement, the following terms shall have the meanings specified:

"Additional Services" means those services, other than Related Services, that Block has authorized Franchisee to perform under the Licensed Marks by the attachment of an addendum to this Agreement describing such Additional Services and the applicable terms and conditions, including payment of royalties.

"Arbitration Notice" means the written notice sent by either party to the other requesting arbitration of a dispute or Breach.

"Breach" means the happening of one or more of the grounds for termination of this Agreement set forth in paragraph 13.

"Controlled Entity" means a corporation or partnership in which Franchisee is the beneficial owner of a majority (over 50%) of each class of voting securities (if a corporation) or is the controlling general partner (if a partnership).

"Franchise Territory" means the City of _Collierville_, in the County of _Shelby_ and State of _Tn_.

"Gross Receipts" means all amounts received by Franchisee from the preparation of tax returns and performance of Related Services including, but not limited to, computer services in connection with the preparation of tax returns and performance of Related Services, and all amounts received from the performance of Additional Services if the addendum regarding any Additional Service does not specifically provide for the payment of royalties.

"Incapacitated" or "Incapacity" means the inability of Franchisee or a Principal, according to competent medical authority to perform the duties and obligations under this Agreement for a period of one year or more as the result of illness or accident.

"Licensed Marks" means the name and service mark "H&R BLOCK" and, with respect to operating an income tax return preparation service and performing Related Services, the service marks "THE INCOME TAX PEOPLE", "AMERICA'S LARGEST TAX SERVICE", "EXECUTIVE TAX SERVICE", "NATION'S LARGEST TAX SERVICE", and any other name or service mark that may be adopted by Block or registered by Block under appropriate service mark or trademark registration laws for use in such business and performing such services.

"Manual" means the H&R Block Policy and Procedure Manual, as amended by Block in its sole discretion from time to time.

"Off Season" means that portion of a calendar year other than the Tax Season.

"Principal" means an individual who is an executor or executrix, trustee, director or partner of a proposed transferee or a director or partner of a Controlled Entity and who personally assumes and agrees to be bound by all of the terms of this Agreement, in a document satisfactory to Block, to the end that Block may look to such individual, in addition to the proposed transferee or the Controlled Entity, for the proper performance of this Agreement.

"Related Services" means those products or services that Block has from time to time in writing authorized Franchisee to perform that deal with the preparation of income tax returns, such as, by way of illustration and not limitation, income tax return preparation schools and other similar products or services directly related to the business of preparing income tax returns.

"Renewal Terms" means those successive five-year terms after the initial term of this Agreement.

**EXHIBIT**

B

S-8
(6/84)
Page 1

Population shall be determined as of the date of this Agreement from the most recent Standard Rate and Data Service or comparable figures. Such deposit shall be held by Block without interest, may be commingled with Block's other funds, may be applied by Block to the payment of all unpaid amounts owed to it by Franchisee and to the payment of all costs and expenses, including attorneys fees, incurred by Block in enforcing this Agreement, and shall be forfeited by Franchisee if Block terminates this Agreement pursuant to paragraph 13.

The parties expressly acknowledge that the forfeiture or application by Block of the deposit, or any portion thereof, shall not affect any other rights or remedies Block may have at law or in equity and that the forfeiture or application of such deposit shall not constitute liquidated damages or otherwise limit the damages or other legal or equitable remedies available to Block hereunder. To the extent not otherwise applied in accordance with this paragraph, the deposit shall be refunded to Franchisee two years after the termination, transfer or other disposition of this Agreement, provided (i) that the deposit shall be refunded within 90 days after the effective date of a transfer upon the death of Franchisee; and (ii) that upon a transfer to a Controlled Entity, the deposit shall be held by Block in accordance with this paragraph in satisfaction of the obligations of such Controlled Entity under this paragraph and Franchisee shall have no further interest in the deposit.

### 6. Royalties; Reports.

Franchisee shall pay Block royalties on Franchisee's Gross Receipts in each calendar year in the following amounts and at the times specified:

| On That Portion of Gross Receipts That Is | The Early Payment Royalty Rate Is | The Standard Royalty Rate Is |
|---|---|---|
| $5,000 or less | 50% | 60% |
| Over $5,000 | 30% | 40% |

The standard royalty rate applies if neither the early payment royalty rate nor the 20% royalty rate described below is applicable. The early payment royalty rate applies if the royalty is paid to Block not later than five days after the end of the Reporting Period to which the royalty relates and no amounts payable to Block under this Agreement or otherwise are overdue. The royalty rate on the excess Gross Receipts for a calendar year over the average of the Gross Receipts for the two previous calendar years is 20% if paid to Block not later than five days after the end of the Reporting Period to which the royalty relates and is not subject to further reduction for early payment.

Royalties are due 30 days after the end of the Reporting Period to which they relate. Franchisee may defer until March 15 of each year the payment of 33 1/3%, if the standard royalty rate applies, or 40%, if the early payment royalty rate applies, of each royalty payment due on that portion of Gross Receipts that is $5,000 or less (up to an annual maximum deferred amount of $1,000). The entire deferred amount will be payable, without further discount for early payment, no later than March 15.

Within five days after the end of each Reporting Period, Franchisee shall submit to Block a copy of every customer receipt (in the form furnished by Block) and such other reports as may be required from time to time in the Manual.

### 7. Instruction and Other Assistance.

At its expense, Block will (a) advise and instruct Franchisee in the operational aspects of Franchisee's business; (b) advise in the selection and location of an office or offices; (c) furnish information necessary to establish an operating budget; (d) design forms which shall be used by Franchisee in Franchisee's business related to the preparation of tax returns and advise as to quantities needed; (e) initially train Franchisee in the preparation of tax returns (provided that such training shall take place at such times and at such places as Block shall designate) and thereafter make training material available to Franchisee; and (f) furnish all specialized forms (such as income tax forms and Block internal reporting forms) and designated equipment (which, subject to Block's then current practice, may include duplicating equipment and signs but not computer equipment, which is covered by paragraph 8) as specified in the Manual and deemed necessary from time to time by Block for Franchisee to efficiently operate hereunder, for Franchisee's use in his tax return preparation business. Any such designated equipment or specialized forms will be furnished without charge to Franchisee except that Franchisee will be responsible for freight charges (as determined by Block) on all items other than duplicating equipment and signs. All equipment shall be installed and (except for duplicating equipment) maintained in good working order by Franchisee. Block shall further supply, without charge, all such other items set forth as items available without charge (except for freight) to Franchisee in the Manual. At its expense, Block will furnish all promotion and advertising deemed advisable by it in its sole discretion, provided that Franchisee will bear the cost of any discount granted pursuant to any discount program promoted by Block in which Franchisee participates and that Block, in its sole discretion, may determine to pay Franchisee an amount determined by Block for certificates redeemed by Franchisee in connection with those programs specified by Block. Block has no obligation to provide any services, supplies or other items not specifically set forth in this Agreement.

### 8. Computer Equipment and Software.

Block may make available to Franchisee at no charge computer software (and any enhancements or revisions thereto) specifically designed for the computerized preparation of tax returns, at such time as Block in its sole discretion determines.

of this Agreement, any other business of Franchisee, including, but not limited to, copies of all customer receipts, customer tax returns, bank statements; full, complete and accurate books and records of accounts prepared in accordance with generally accepted accounting principles; Franchisee's tax returns and any and all other reports, documents and records required to be filed with any governmental authority or maintained pursuant to any Federal, state or local law. All of such books and records shall be open to inspection by Block during Block's regular business hours.

### 12. Limitations on Competition and Disclosure.

(a) Franchisee covenants that: (i) during the term hereof he will not compete, directly or indirectly whether as an owner, stockholder, partner, officer, director or employee, with Block or Block franchisees in the business of preparing tax returns or performing Related Services in or within 45 miles of the Franchise Territory; in the franchise territory granted to any other Block franchisee; or within 45 miles of any office operated by Block; (ii) for a period of one year after the termination of this Agreement or the Transfer or other disposition of this franchise, he will not directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee, solicit by mail, phone or in person, or divert from Block or Block franchisees any person for whom Franchisee prepared a tax return or performed Related Services or Additional Services at any time during the term of this Agreement for the purpose of rendering of services in connection with the preparation of tax returns or performance of Related Services or Additional Services; and (iii) for a period of one year after the termination of this Agreement or the transfer or other disposition of this franchise, he will not compete directly or indirectly, whether as an owner, stockholder, partner, officer, director or employee, with Block or Block franchisees in the business of preparing tax returns or performing Related Services or Additional Services in or within 45 miles of the Franchise Territory.

(b) Franchisee further covenants that Franchisee will never (i) divulge to or use for the benefit of any person, association or corporation outside of the H&R Block organization, any information or knowledge concerning customers, the methods, promotion, advertising or any other systems or methods of operation of Block's business or that of Block's franchisees which Franchisee may have acquired by virtue of his operations under this Agreement; (ii) use any materials regarding Additional Services without payment of the applicable royalty therefor and execution of an addendum regarding such Additional Services; or (iii) do any deliberate act prejudicial or injurious to the goodwill or name of Block. Information furnished to employees shall be reasonably limited to that which directly relates to such employee's duties and assists in the proper performance of such duties.

(c) If Franchisee violates the provisions of subparagraph (a) of this paragraph 12, Block shall be entitled to an accounting of revenues and payment of royalties pursuant to paragraph 6 or the applicable addendum regarding Additional Services with respect to those revenues, if any, derived by Franchisee from the preparation of tax returns or performance of Related Services or Additional Services in violation of such provisions, such payments to continue for one year or the remainder of the initial or any Renewal Term of this Agreement, whichever is longer. The parties expressly acknowledge and agree that such payment shall not affect any rights or remedies Block may have, at law or in equity (including the right to seek injunctive relief), against Franchisee by reason of the violation of this paragraph.

(d) Franchisee has carefully read and considered the provisions of subparagraphs (a) and (b) and, having done so, acknowledges that such restrictions, including but not limited to the time periods and geographical areas of such restrictions, are fair and reasonable and are reasonably required for the protection of the interests of Block, its franchisees and their respective clients. Franchisee further acknowledges that the qualifications for a franchise by Block are special, unique and extraordinary, and that this Agreement would not be entered into by Block except upon condition that the provisions of this paragraph 12 be included herein and that, as such, they be enforceable, in the event of a breach by Franchisee, by injunctive relief. Franchisee disclaims any defense to the enforcement of the provisions of this paragraph 12 founded on any claim by Franchisee against Block.

(e) If any provision of subparagraph (a) or (b) relating to time periods or geographical areas is found by a court of competent jurisdiction to exceed the maximum time period or geographical area such court deems reasonable and enforceable, the parties agree that such court may enforce such provisions for such time period and within such geographical area as the court finds to be reasonable. In addition, Block in its sole and absolute discretion may unilaterally reduce the scope of any provision of subparagraph (a) or (b) relating to time periods or geographical areas.

(f) If, notwithstanding the foregoing, any provision of subparagraph (a) or (b) is held to be invalid or unenforceable, such provisions shall be deemed to be separable and divisible from the remaining provisions, which shall continue to be valid and enforceable as though the invalid and unenforceable provision had not been included herein.

(g) Franchisee will cause each individual employed to prepare tax returns or to supervise the preparation of tax returns to execute an agreement, in the form prescribed by Block, containing substantially the same covenants against competition and disclosure as are set forth in subparagraphs (a) and (b)(i).

### 13. Termination of Agreement.

The following constitute grounds for termination of this Agreement by Block:  (a) any material and substantial breach of the terms hereof by Franchisee including, without limitation, (i) abandonment, (ii) improper use of the Block name, (iii) failure to

of the initial 90 days. If a decision is ~~rendered~~ within the time set forth herein, the arbitration ~~may~~ be terminated by either party and either party may then proceed to have the matter resolved in a court of law. The arbitrator shall have no right to include or decide issues not directly involved in any dispute before him. The expense of arbitration shall be borne equally by Block and Franchisee. The decision of the arbitrator shall be legally binding. The location of any arbitration proceeding shall be determined by the arbitrator provided that such arbitration shall take place within the state in which the Franchise Territory is located.

### 16. Assignability.

Franchisee may not subfranchise, sublicense or Transfer and retain any interest (other than a bona fide security interest) in this Agreement. The prior written approval of Block shall be required for any Transfer, other than a Transfer to a Controlled Entity. Block will not arbitrarily or unreasonably exercise its right to approve or disapprove any proposed Transfer and any disapproval by Block with respect to a proposed Transfer shall be only for material and substantial reasons including, without limitation, a proposed Transfer in violation of any provision of this Agreement.

Approval by Block of a Transfer shall be subject to and conditioned upon the following: (i) receipt by Block of a Request to Transfer, which request shall include the name, address and principal occupation or business activity of the proposed transferee and such other information (including financial statements, business references and similar information) that Block reasonably requests for the purpose of approving or disapproving such Transfer; (ii) payment of all amounts due Block from Franchisee and the absence of any other default by Franchisee under this Agreement; and (iii) the execution by the transferee of the then current form of Block Satellite Franchise Agreement and payment of any required deposit. If the proposed transferee is an estate, trust, corporation or partnership then Franchisee shall also furnish to Block the name, address and principal occupation of each executor or executrix, trustee, officer and director or each partner, as the case may be, of such estate, trust, corporation or partnership together with the name, address, principal occupation, and ownership interest of each significant stockholder (that is, a holder of 10% or more of any class of voting securities of such corporation) and the name and address of a Principal, and such other information (including financial statements, business references, and the like) that Block reasonably requests for the purpose of approving or disapproving such proposed transferee or Principal.

Block shall have 30 days from the date that all of the conditions set forth above have been satisfied and the Request for Transfer and all related documents have been received at Block's principal office in Kansas City, Missouri to approve or disapprove such proposed transferee and, if applicable, the Principal thereof, provided that, without limiting Block's rights to approve or disapprove such proposed transferee or Principal, the proposed transferee or Principal must demonstrate to the satisfaction of Block that he meets all of the requirements for becoming a franchisee including, but not limited to, possessing good moral character, adequate financial resources, and the ability to operate the business of the franchise in accordance with Block's high standards. If Block approves the proposed transferee and Principal, the Transfer shall become effective upon the written approval of Block. If Block disapproves the proposed transferee or Principal, it shall give Franchisee written notice setting forth the reason or reasons for such disapproval within the above 30-day period. In the event of such disapproval, Franchisee may request arbitration or, one time only, submit an alternate Request for Transfer to Block within 30 days after the giving of notice of such disapproval, subject to all of the foregoing conditions with respect to the initial Request for Transfer.

An assignment of this Agreement to a Controlled Entity shall not be subject to the requirements on Transfer set forth above. However, Block shall be notified in writing at the time of such assignment of the name of the Controlled Entity, the effective date of such assignment and the name and address of each officer, director and significant shareholder(s) (as defined above), if a corporation, and of each general partner, if a partnership, and shall thereafter be notified in writing from time to time of any changes in the information required. In the event of an assignment of this Agreement to a Controlled Entity, Franchisee shall remain liable for the prompt and faithful performance of all terms, convenants and conditions of this Agreement until a Principal is appointed and approved by Block or until a Transfer occurs.

Franchisee's interest under this Agreement may be mortgaged or pledged without Block's approval, provided that no Transfer of Franchisee's interest on the foreclosure of such mortgage or pledge shall be effective until all of the requirements set forth in this paragraph 16 have been satisfied. No such mortgage or pledge shall limit Block's right to terminate this Agreement in accordance with its terms.

### 17. Change of Principals.

If Franchisee is a Controlled Entity for which no Principal has been appointed and approved by Block and the prior Franchisee dies or is incapacitated, or if Franchisee is an entity that is required by paragraph 16 to have a Principal and such Principal dies or is incapacitated, then, in either case, Franchisee shall notify Block in writing within 60 days after the occurrence of such event of the name and address and such other information (including financial statements, business references and similar information) that Block reasonably requests regarding a new Principal. Block shall have 30 days after receipt of such notice to approve such Principal (and may request further information), which approval will not be unreasonably withheld. Any disapproval by Block will be evidenced by a written notice setting forth the reason or reasons for such disapproval given within the above 30-day period. In the event of disapproval, Franchisee may propose the name of an alternative Principal within 30 days after notice of disapproval, subject to all of the foregoing conditions with respect to the initial notification of a proposed Principal or may request arbitration within such time period. If Block does not disapprove such Principal, such Principal shall execute the document required to become a Principal and shall promptly forward it to Block. If such Principal fails or refuses to promptly execute such document or if no Principal is approved by Block as provided, Block shall have the right to terminate this Agreement.

**27. Heirs, Successors and Assigns.**

Except as limited by paragraph 16 and related provisions herein, this instrument shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, executors, administrators, and legal representatives, of the parties hereto.

**28. Notices.**

All notices required hereunder shall be in writing and shall be deemed sufficiently served by mailing, postage prepaid, via certified or registered mail, with respect to Franchisee, to the address shown below, and with respect to Block, to its principal office, 4410 Main Street, Kansas City, Missouri or to such other address(es) that may hereafter be designated by either party to the other, and shall except as otherwise provided herein be deemed to have been given as of the date so mailed.

**29. Binding Effect.**

This Agreement shall not be binding on either Block or Franchisee unless and until this Agreement has been executed by Franchisee and an executive officer of Block (that is, the President, Executive Vice President, or any Vice President of Block), and attested to by its Secretary or Assistant Secretary.

**In Witness Whereof,** the parties hereto have executed this Agreement the date first above written.

_(Franchisee)_

H&R Block (_____), Inc.
**(Block)**

By _____          _Director Field Operations_          110 Mulberry St.
_(Name and Office)_                                                  _(Address)_

By _____          Collierville, TN   38017
**Assistant Secretary**                                    _(City, State)_

_____Nov 30_, 198 _4_   _Collierville, TN._

H & R Block, Inc.
4410 Main Street
Kansas City, Missouri   64111

Gentlemen:

   Re:   Request for Approval of Transfer to Individual

   The undersigned Franchisee under the Satellite Franchise
Agreement(s) described in the attached Assignment Agreement
requests your approval (as required by the terms of said
Satellite Franchise Agreement(s)) to transfer and assign said
Satellite Franchise Agreement(s) to the following Transferee:

_Phillip A Murphy_
Name
_110 Mulberry St_
Address
_Collierville TN 38017_
City                    State           Zip Code
_Tax Preparation_
Principal business activity

   Attached for your review is a questionnaire (including
financial statement) which has been completed and signed by
the Transferee as of a date no earlier than 90 days prior to
the date of this request.

   The executed Assignment Agreement which is attached will
become effective (as provided by the terms of said Satellite
Franchise Agreement(s)) 30 days after your receipt of this
letter and enclosures unless you disapprove of the Transferee
in writing to the undersigned within said 30-day period, setting
forth the reasons for such disapproval.

                    Very truly yours,
          Benneficiary of Estate of William M. Allen
          _A. Alexander Allen_
                         Franchisee
          _#10 Mulberry St._
                         Address
          _Collierville TN 38017_
          City      State      Zip Code

## ASSIGNMENT AGREEMENT

(for transfer to an individual)

THIS AGREEMENT is made and entered into as of _____*Nov 30*_____, 198*4*, by ~~A. ALEXANDER ALLEN~~ William M. Allen_____ (the "Franchisee") and _*Phillip A. Murphy*_____ (the "Transferee"), WITNESSETH:

WHEREAS, the Franchisee is the holder of the right to prepare income tax returns under the name and service mark "H & R Block" pursuant to the Satellite Franchise Agreement(s) described below (the "Satellite Franchise Agreement", whether one or more), and

WHEREAS, the Franchisee desires to transfer and assign to the Transferee all of the Franchisee's right, title and interest under the Satellite Franchise Agreement, and the Transferee desires to accept such transfer and assignment, and

WHEREAS, the Franchisee and Transferee acknowledge that such transfer and assignment may be made only with the approval of the franchisor named in the Satellite Franchise Agreement (the "Franchisor"), and only upon compliance with certain terms and conditions of the Satellite Franchise Agreement, one such condition being that Transferee execute the current form of Block Satellite Franchise Agreement and pay the deposit required by such Agreement, and Transferee is willing and intends to execute such current form of Agreement and to pay such deposit;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises contained in this Agreement, the parties covenant and agree as follows:

1. Assignment. The Franchisee hereby transfers, assigns and delivers to the Transferee all of the Franchisee's right, title and interest in and to the Satellite Franchise Agreement (but not any deposits held by the Franchisor under the Satellite Franchise Agreement), subject to the approval of the Franchisor, as required by such Satellite Franchise Agreement, and subject to all other terms, covenants and conditions of such Satellite Franchise Agreement and to the obligations incumbent upon the Franchisee under such Satellite Franchise Agreement.

2. Acceptance. The Transferee hereby accepts such transfer, assignment and delivery of the Franchisee's right, title and interest in and to the Satellite Franchise Agreement and, for the benefit of the Franchisee and the Franchisor, and to induce the Franchisor to approve the transfer provided for herein, the Transferee agrees to execute the current form of Block Satellite Franchise Agreement to replace the Satellite Franchise Agreement transferred to the Transferee by the Franchisee, and to faithfully perform all of the terms, covenants, conditions and obligations incumbent upon the franchisee under such current form of Block Satellite Franchise Agreement.

3. Effectiveness. This Agreement, and the foregoing assignment and acceptance, are subject to the approval of the Franchisor named in the Satellite Franchise Agreement, and shall become effective only if, 30 days after receipt by said Franchisor of the Request for Approval of Transfer (attached hereto), said Franchisor shall not have disapproved of the Transferee in writing to the

2910A-9-84

EXHIBIT D

## RECEIPT

The undersigned hereby acknowledges receipt of a copy of H & R Block, Inc.'s Uniform Franchise Offering Circular and Franchise Disclosure Statement dated July 27, 1984.

Dated this _____11Th_____ day of _____November_____, 19_84_.

_Phillip A. Murphy_

*                    *                    *                    *

## RECEIPT

The undersigned hereby acknowledges receipt of a copy of the Satellite Franchise Agreement with all blank spaces completed.

Dated this _11th_ day of _Nov_____, 19 _84_.

_Phillip A. Murphy_

*                    *                    *                    *

## FOR SATELLITE DIRECTOR'S USE ONLY

Date Satellite Franchise
Agreement and deposit received:    _11- 10 -84_

_Arnold F. Bigler_
Satellite Director

D-1

H&R Block, Inc.
Executive Offices
4410 Main Street
Kansas City, Missouri 64111

(816) 753-6900

September 23, 1982

Ms. Mary Ellen Murphy
313 North Ave.
Henderson, TN    38340

Dear Ms. Murphy:

Your request to transfer and assign your interest under your
Satellite Franchise Agreement for Bolivar, TN dated July 20,
1978 to Betty O. Plunkett has been received.

Such transfer and assignment is approved, subject to the
following conditions:

NONE

Our records have been changed to reflect such transfer and
assignment, effective September 23, 1982.

Very truly yours,

H & R BLOCK, INC.

Perb Fortner
Director,
Satellite Franchise Operations

PF/cm

cc:  Betty O. Plunkett

I have not recieved my $300⁰⁰ deposit
from the Bolivar Tn. Office. TRANSFER
this To the deposit for Collierville Tn.
franchise



**THE INCOME TAX PEOPLE**

H & R Block, Inc.
4410 Main St.
Kansas City, MO    64111

Gentlemen:

This is to notify H&R Block, Inc. of my intent to sell and transfer ownership and control, without reservation, of the satellite franchise for the City Of Collierville, Tennessee, from myself, A. Alexander Allen — beneficiary of the Estate of William M. Allen, owner of record — to Mary Ellen Murphy, presently of Henderson, Tennessee, effective 1 December, 1984.  The mailing address will remain the same.

This sale and transfer contingent on the company's approval of Ms. Murphy as the new owner.

Yours very truly,

A. Alexander Allen

**H & R BLOCK**

H & R BLOCK
**Personal Qualifications Summary**

Date Received _____

All information given here will be held in strict confidence.

### A. Personal Information

1. Name _Phillip A. Murphy_
2. Residence address _313 North Ave, Henderson Tn 38340_
   City _____ State/Province _____ Zip/Postal Code
3. Residence telephone (_901_) _989-4285_
   Area Code
4. Date of birth _11-16-36_
5. Are you married? _Yes_  divorced?_____  separated?_____

   single?_____  widowed?_____
6. Name of spouse _Mary Ellen Murphy_
7. Number of children and ages _(4)   21, 18, 15, 9_
8. What was your last serious illness? _none since childhood_

   How long did it last?_____  When _____
9. Present health is excellent _X_, good_____, fair_____, poor_____
10. Social Security/Social Insurance Number _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_

### B. Education

| Kind of School | Name and Location | Graduate Yes | No |
|---|---|---|---|
| Elementary (Grade School) | Washington Elem.   Vandalia Ill | X | |
| Secondary (High School) | Western Military Academy  Alton, Ill | X | |
| College or University | Eastern Ill. Univ. Charleston, Ill | X | |
| Trade or Correspondence | + Univ of Miss  Oxford Ms | | |
| Other Education | | | |

### C. Business Experience

1. Principal occupation _Real Estate Broker + H+R Block Franchise owner_
2. Employer and address _Cherokee Landing_
3. Approximate annual income for last tax year $ _30,000 00_
4. Have you been, or are you now, an officer, director, partner, or owner (whether as investor or otherwise) of a business franchise (other franchisor or franchisee)? _No_ ; if so, specify _____

5. List those business organizations, if any, in which you held office of either director or officer _____

6. Have you, or has any business organization controlled, directly or indirectly, by you, been adjudicated a bankrupt or been a party to a reorganization under the Federal bankruptcy laws? _No_ ; if so, specify _____

PRINTED IN U.S.A.

7. Are any lawsuits pending, or to your knowledge, threatened, against you? _No_ ; if so, specify _____

8. Are there any judgments outstanding against you? _No_ ; if so, specify _____

9. Have you ever been convicted of a crime (other than traffic misdemeanors)? _No_ ; if so, specify _____

10. Have you served in the military? _No_ If so, which branch? _____

    Have you received an honorable discharge? _____ If not, explain _____

11. Business experience for past 10 years:

| From | To | Firm | Position |
|------|-----|------|----------|
| 1978 - Present | | Co-owner H+R BLOCK Franchise | |
| 5/84 - Present | | CHEROKEE LANDING | Real Estate Sales |
| 8/76 - 5/83 | | FREED-HARDEMAN College | Teacher |
| 8/69 - 7/76 | | NorthEastERN OKLA STATE UNIV | " |

12. Nature of supervisory experience, if any:

Supervised Office staff, MAINTANCE staff, + CLeaning staff
for All College housing At A University with 5,000 students

## D. References

1. Character references (list three, with addresses)                    Reference Check

   Liz Cowart  109 Hundley Ave, Jackson TN 38301    ☐
   Paul Tucker  Hwy 45 N, Henderson TN 38340    ☐
   Gerald Hovater, FHC, Henderson "    "    ☐

2. Business references (list three, with addresses)

   Anthony Helm (lawyer) 128 MAIN St  Henderson TN 38340   ☐
   Roger Whitten  Rt 3 Box 65, Henderson TN 38340   ☐
   Bob East (pres.) Chester Co. BANK  "  "  "   ☐

3. Your personal bank HARDEMAN County, Middleton TN    ☐
   how long? 7 mo.

4.  Your business bank(s) *CHESTER Co. BANK    (H+R Block Acct)*

how long?    *8 yrs*

## E. Financial Statement

### Assets

| | |
|---|---|
| Cash | $ *1500* |
| Cash value life insurance | *2500* |
| Securities (at lower of cost of approximate market): | |

Notes receivable:

Accounts receivable:

Real estate (at lower of cost or approximate market):

| | |
|---|---|
| *Residence* | *60,000* |
| *Investment property* | *33,000* |
| *Trailor* | *5,000* |

Other assets

| | |
|---|---|
| *Autos (3)* | *14,500* |
| *boat, Tractor* | *2500* |
| **TOTAL ASSETS** | $ *119,000* |

### Liabilities

| | |
|---|---|
| Notes payable (unsecured) | $ |
| Notes payable (secured, including mortgage notes) | *74000* |
| Borrowed on life insurance | *2000* |
| Accounts payable (not due) | |
| Accounts payable (past due) | |
| Taxes due and payable | *0* |

Other liabilities

_____        _____

_____        _____

TOTAL LIABILITIES                       $ _76,000_

Net Worth (total assets less total liabilities)    $ _43,000_

Further financial information

   Guarantees or other accomodations        $ _____

   Amount of life insurance                 _____

   Other contingent liabilities and obligations (describe):

_____

_____

   Please insert below any other information which you believe would assist us in determining your qualifications to be responsible for performing all of the terms, covenants, conditions and obligations under an H & R Block Satellite Franchise Agreement.

The H+R Block office will be MANAged by my
wife. She has mANAged AN H+R Block office
for the last 14 years

_____

_____

_____

   All of the information contained in this Questionnaire is current as of __NoV__ __30__, 19_84_, and is true and correct to the best of my knowledge. I authorize inquiry of any person or firm listed above for information regarding my character or financial condition.

                          _Phillip A. Murphy_

I have reviewed all of this Personal Qualifications Summary.

_Russel JB ifer_                    _12/11/84_
Satellite Franchise Director          Date

_____        _____
Regional Director                      Date

2908-4-81
Page 4

**H&R BLOCK**

H&R Block, Inc.
Corporate Headquarters
4410 Main Street
Kansas City, Missouri 64111
(816) 753-6900

January 22, 1985

Mr. A. Alexander Allen
Beneficiary of Estate of William Allen
110 Mulberry St.
Collierville, TN   38017

Dear Dear Mr. Allen:

Your request to transfer and assign your interest under your
Franchise Agreement for Collierville, TN dated June 20, 1977 to
Phillip Murphy has been received.

Such transfer and assignment is approved, subject to the
following conditions:

    The $300 deposit now being held by H & R Block in the name
    of Mary Murphy for Bolivar, TN will be transferred to
    Phillip Murphy for Collierville, TN. and an additional
    $300 will be put up to cover the required $600 satellite
    deposit.

Our records have been changed to reflect such transfer and
assignment, effective January 17, 1985.

Very truly yours,

H & R BLOCK, INC.

Perb Fortner
Director,
Franchise Operations

PF/cm

cc:  Phillip Murphy
     Larry Carver
     Arnold Bixler

REGION ___4___



PC   M   CTPC

## SATELLITE FRANCHISE
## ELECTRONIC FILING AGREEMENT

THIS AGREEMENT is entered into as of the __19__ day of __November__, __1999__, by and between H&R Block _____EASTERN_____ Tax Services, Inc., a Missouri corporation ("Block"), and ___Phillip A. Murphy_____ ("Franchisee").

WHEREAS, Block and Franchisee are parties to a Satellite Franchise Agreement or Satellite Franchise Agreements identified by date(s), franchise territory or territories and location code(s) as follows:

| Date | Franchise Territory | Location Code |
|------|--------------------|---------------|
| 11-30-84 | Collierville, TN | 39950 |
| 11-19-89 | | |
| | | |
| | | |
| | | |

(all of which may be referred to collectively as the "Satellite Franchise Agreement" or may be referred to separately as "each separate Satellite Franchise Agreement," as the context requires); and

WHEREAS, Block is willing to permit Franchisee to use, and Franchisee desires to use, a system developed by Block ("Block's System") by which Franchisee may provide to Franchisee's customers services (referred to jointly herein as the "Electronic Filing Service") consisting of (1) the electronic filing of income tax return information with the Internal Revenue Service and, in some cases, with state income tax authorities (referred to jointly herein as "IRS"); (2) the direct deposit by the IRS of a customer's income tax refund into his or her bank account; (3) the "RAL Service," which includes the electronic transmission to a lending institution ("Bank") designated by Block of income tax return information and other information necessary for a customer to apply to Bank for a refund anticipation loan ("RAL"), the electronic transmission of the approval or rejection of the RAL application from Bank to Block or Franchisee, the issuance of a RAL disbursement check to an approved applicant and the deposit by the IRS of such customer's income tax refund into the customer's designated account at Bank; and (4) the refund anticipation check service ("RAC Service") (a similar service previously offered was known as electronic refund service, or ER Service), which includes the electronic transmission to a depository bank designated by Block ("Depository") of a customer's request for a refund anticipation check ("RAC") and such other information as is required by Depository in connection with such request, the deposit by the IRS of such customer's income tax refund into customer's designated account at Depository and the subsequent issuance of a RAC to the customer in

**EXHIBIT**

C

Sat. Franchise Electronic Filing Agreement 7/98

the amount of the customer's income tax refund, less any fees that the customer has agreed may be withheld from such check by Depository; and

WHEREAS, subject to modification pursuant to Section 17 herein, Franchisee may make use of Block's System to provide the Electronic Filing Service to Franchisee's eligible customers through one of three methods, to wit, (1) by accessing a computer or computers to Block's System, entering income tax return information, direct deposit information, any RAC request information and any RAL application information (which information will hereafter be jointly referred to as "Customer Data") on such computer(s) and transmitting to CompuServe Network Services Incorporated (formerly, CompuServe Incorporated) (or any other telecom-munications businesses used by Block in connection with Block's System, all of which shall be jointly referred to herein as "CompuServe") such Customer Data (which optional method shall hereafter be referred to as the "PC Option"); (2) by delivering Customer Data and such documentation as is required by Block to a Block processing center designated by Block from which Block will transmit such Customer Data to CompuServe (which optional method shall hereafter be referred to as the "Messenger Option"); or (3) by delivering Customer Data and such documentation as is required by Block to "Franchisee's Agent" who holds a franchise from Block to engage in the business of preparing tax returns and performing "Related Services" under Block's names and service marks and who agrees with Franchisee (with Block's approval) to transmit such Customer Data to CompuServe on Franchisee's behalf (which optional method shall hereafter be referred to as the "Courier to PC Option");

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, the parties agree as follows:

1.     Term.   Unless terminated earlier as hereinafter provided, (1) the initial term of this Agreement shall be for a period commencing on the later of November 1, 1998, or the date of this Agreement and ending on October 31, 1999, and (2) this Agreement shall, on each November 1 thereafter, be automatically renewed for successive renewal terms of one year each.

2.     Use Of System.   Subject to the terms and conditions set forth below, and the terms and conditions of the Satellite Franchise Agreement, Block agrees to permit Franchisee to use Block's System during the term of this Agreement to provide the Electronic Filing Service to Franchisee's customers.  Franchisee hereby elects to provide the Electronic Filing Service to Franchisee's customers by means of the _____PC_____ Option described above.  Franchisee shall not utilize any other optional method to provide the Electronic Filing Service through use of Block's System without the prior written consent of Block.  If the "Courier to PC Option" has been elected by Franchisee, "Franchisee's Agent" shall be _____, whose franchise territory is _____.

Block may from time to time announce that other methods of use of Block's System or new services added to the services comprising the Electronic Filing Service are available to Franchisee.  In any such event, Franchisee may change to a new method or add such new services in accordance with procedures specified by Block.

During the initial term and any renewal term of this Agreement, Block's System may be used by Franchisee to provide to Franchisee's customers each separate service comprising the Electronic Filing Service only during that portion of such term in which Block's System is made available by Block for use at Block's Company-owned offices to provide such service to Block's customers. Block shall announce via the Block News Network, TaxNet or any other written or electronic communication directed to participating franchise owners any dates established by Block as the first date or last date during such term that a particular service may be provided by Franchisee to Franchisee's customers through the use of Block's System. Any such announcement shall not constitute a "notice" required or given under this Agreement and need not meet the notice requirements set forth in Section 24 herein.

3.   Conditions Precedent.  Block and Franchisee agree that this Agreement, and their respective rights and obligations during the initial term and each renewal term hereunder, are expressly conditioned upon (a) Block's being accepted by the IRS to participate in the electronic filing program for the "Tax Season" (the period from the first Monday after January 1 through the last date on which individual federal income tax returns for the preceding year may be filed without an extension of time or incurring any penalty for late filing) included in such term; (b) Franchisee's being accepted by the IRS to participate in the electronic filing program for the Tax Season included in such term; and (c) Franchisee's satisfactory completion during such term of such training in the use and operation of Block's System as is determined by Block to be necessary.

4.   Integration With Franchise Agreement.  The parties hereto agree that the Electronic Filing Service and each separate service which is a part thereof constitute "Related Services," as such term is defined in the Satellite Franchise Agreement, and that all provisions in each separate Satellite Franchise Agreement under which the Electronic Filing Service is conducted which pertain to Related Services shall pertain to the Electronic Filing Service. Any provision in this Agreement pertaining to the Electronic Filing Service which differs from any related provision of the Satellite Franchise Agreement pertaining to Related Services shall constitute an amendment to the Satellite Franchise Agreement solely with respect to the Electronic Filing Service. Franchisee's material and substantial breach of the terms of this Agreement shall entitle Block, in addition to all other remedies for such breach herein provided, to terminate each separate Satellite Franchise Agreement to which the breach relates in accordance with the terms hereof.

5.   Licensed Marks; Advertising.  The parties hereto agree that any name or logotype used by Block in connection with the Electronic Filing Service shall constitute a "Licensed Mark," as such term is defined in the Satellite Franchise Agreement. Franchisee agrees to use the name or names and/or logotype or logotypes selected by Block for use by Block and Franchisee in describing or marketing the Electronic Filing Service, and Franchisee agrees not to use any other name or logotype in connection with the Electronic Filing Service without the express written consent of Block. Franchisee shall not publish or release any communication relating to the Electronic Filing Service (a) inferring a special relationship between (i) the IRS, the Financial Management Service and/or the Department of the Treasury, and (ii) Franchisee, Block, CompuServe, Bank, Depository and/or any other person or entity, or (b) inferring endorsement of the Electronic Filing Service, Block's services, Franchisee's services, Bank's services, Depository's services or Block's System by the IRS, the Financial Management Service or the Department of the Treasury. All communications relating to the

Electronic Filing Service shall comply with the then current IRS Revenue Procedures or other IRS announcements or publications containing the obligations of participants in the electronic filing program and the specifications for the electronic filing of income tax returns (the "Specifications") and any other rules, regulations or restrictions issued by the IRS.

6.  Grant Of License (PC Option Only).  If Franchisee makes use of Block's System by means of the PC Option, Block hereby grants Franchisee a revocable license to use the software and user's guide furnished by Block to Franchisee pursuant to Section 7, below, for the sole purpose of conducting the Electronic Filing Service, subject to the limitations and restrictions set forth in this Agreement.

7.  Items To Be Furnished By Block (PC Option Only).  If Franchisee has elected to use Block's System under the PC Option, and if Franchisee has satisfactorily completed such training as is provided by Block pursuant to this Section 7, Block shall provide Franchisee each year during the term of this Agreement with one copy of the software developed as a part of Block's System for use with computers in entering and correcting Customer Data of Franchisee's Electronic Filing Service customers and transmitting such Customer Data to CompuServe, and one copy of a user's guide to such software.  During the initial term and each renewal term of this Agreement, Block shall provide Franchisee with such training in the use and operation of Block's System and such technical and software support as is determined by Block to be necessary.  Any training to be provided by Block shall be held on such dates, at such times, and at such locations as are designated by Block.

8.  Restrictions On Use Of Proprietary Material (PC Option Only).  Franchisee agrees that the license granted by Block to Franchisee herein entitles Franchisee to use the licensed materials, and Franchisee agrees to use such materials, only to operate the Electronic Filing Service, and Franchisee further agrees that, unless expressly authorized herein to do so, Franchisee

a.  will not, without the prior written consent of Block, copy or otherwise reproduce, modify, sell or exchange such materials, or transmit (by telephone lines or otherwise), give away, or disclose such materials to any other person or firm, or permit any other person or firm to do so;

b.  will not license or permit any other person, other than Franchisee's employees in the course and scope of their employment, or firm to use such materials; and

c.  will not, without the prior approval of Block, contract with any person or firm engaged in the conduct of a tax return preparation service to provide a transmission service for such person or firm, and will not use the materials furnished by Block for the benefit of or to assist such person or firm in the conduct of such tax return preparation service.

If requested by Block, Franchisee agrees to (1) return to Block all copies of Block's System software and/or all copies of any user's guide to such software, whether or not such software or guide was furnished by Block, upon the expiration of the initial or any renewal term of this Agreement or upon the termination of this Agreement and (2) execute a certificate, in a form required by Block, that no copies of such software and/or guide have been retained by Franchisee.

Sat. Franchise Electronic Filing Agreement 7/98

4

Franchisee has read and considered the foregoing restrictions carefully and acknowledges that such restrictions are fair and reasonable and are reasonably required for the protection of the interests of Block. Franchisee further acknowledges that this Agreement would not be entered into by Block except upon the condition that such restrictions be included herein and that they be enforceable, in the event of a breach by Franchisee, by injunctive relief.

9.   Hardware (PC Option Only). If Franchisee has elected the PC Option, Franchisee will furnish, install and operate, at Franchisee's own expense, the computers, modems and printers ("hardware") necessary for Franchisee to enter Customer Data, to transmit such Customer Data to CompuServe and to receive and print communications from Block or CompuServe concerning such Customer Data. Such hardware must either meet the exact hardware configurations specified by Block for use with Block's System (which exact hardware configurations shall include, but not be limited to, brand names, types, models and storage capacity) or be hardware compatible thereto with which Block's System and its software will operate, provided that Block's obligation to provide technical and software support services pursuant to Section 7, above, is conditioned upon Franchisee's hardware meeting the exact configurations specified by Block. Hardware meeting the exact configurations specified by Block may be purchased by Franchisee through Block's Supply Department in accordance with such procedures and deadlines as may be established by Block. If the price of the hardware has not been determined at the time an order for such hardware is placed, Block will advise Franchisee of the price as soon thereafter as the price can be determined and at least 10 days prior to shipment, and if such price is not acceptable to Franchisee, Franchisee may cancel the order within five days after Franchisee has been advised of the price. If the hardware is purchased through Block's Supply Department, Franchisee will be responsible for any freight charges (as determined by Block) not paid by the supplier. Block will invoice Franchisee for the hardware and any freight charges and payment of such invoice will be due 10 days after the date of invoice.

10.   Transaction Fee And Other Expense To Be Borne By Franchisee. Franchisee shall pay to Block a transaction fee ("Transaction Fee") of $1.00 per return for all federal tax returns successfully electronically transmitted and $1.00 per return for all state tax returns successfully electronically transmitted for customers of Franchisee.

The successful transmission of a tax return shall be evidenced by an acknowledgement by the IRS or applicable state tax authority of acceptance of such return for filing. Block expressly retains the right to change the Transaction Fee upon ten days prior notice to Franchisee, which notice shall be given in accordance with Paragraph 24. Any such notice shall be given no later than November 1 of the then current calendar year. If Block elects to change the Transaction Fee, Franchisee shall have the right to terminate this Agreement upon giving written notice to Block on or before December 1 of the then current calendar year.

In addition to the Transaction Fees mentioned above, the expense, if any, of furnishing, installing and operating the hardware referred to in Section 9, above, the Service Fees, if any, referred to in Section 11, below, and any processing or other fees relating to the RAL Service or RAC Service mentioned in Section 16, below, Franchisee shall pay all expense relating to the Electronic Filing Service other than any expense for which Block is expressly obligated under the terms of the Satellite

Franchise Agreement. The expense to be paid by Franchisee includes, but is not limited to, wages and commissions paid to employees of Franchisee who assist in the operation of the Electronic Filing Service; such freight charges (as determined by Block), if any, associated with the shipment from Block to Franchisee of the software and user's guide referred to in Section 7, above, if Franchisee has elected the PC Option; such charges, if any, that may be made by Franchisee's Agent to Franchisee, if Franchisee has chosen the Courier to PC Option, for transmitting Customer Data to CompuServe; and all costs associated with delivery from Franchisee to Block or from Block to Franchisee, or, if applicable, between Franchisee's Agent and Franchisee of (a) Customer Data, (b) any RAL or RAC disbursement checks or (c) any documents relating to the Electronic Filing Service as are required by Block.

11.   Service Fee (Messenger Option Only).   If Franchisee has elected the Messenger Option, Franchisee shall pay to Block a fee (the "Service Fee") for the services to be rendered by Block in entering Customer Data received from Franchisee into computers operated by Block, editing such Customer Data, transmitting Customer Data to CompuServe, processing documents required by the IRS in connection with the Electronic Filing Service, and providing to Franchisee such management reports regarding Franchisee's Electronic Filing Service as are determined by Block to be necessary. The Service Fee shall be $3.25 for each tax return successfully transmitted for a customer of Franchisee, as evidenced by an acknowledgement by the IRS of acceptance of such return for filing. Block expressly retains the right to change the Service Fee upon ten days prior notice to Franchisee, which notice shall be given in accordance with Paragraph 24. Any such notice shall be given no later than November 1 of the then current calendar year. If Block elects to change the Service Fee, Franchisee shall have the right to terminate this Agreement upon giving written notice to Block on or before December 1 of the then current calendar year.

12.   Royalties.   Except as otherwise provided in this Section 12, all of Franchisee's gross receipts from the Electronic Filing Service shall be subject to royalties payable by Franchisee to Block at the times and at the royalty rate specified in each separate Satellite Franchise Agreement. It is expressly understood and agreed that the gross receipts from the Electronic Filing Service are in addition to, and not in lieu of, the gross receipts derived by Franchisee from the preparation of the tax returns that are filed electronically, and that, except as provided in this Section 12, the total of all such receipts shall be deemed to be Franchisee's gross receipts for the purpose of calculating franchise royalties payable by Franchisee to Block under the applicable, separate Satellite Franchise Agreement.

If Franchisee has elected the PC Option, Franchisee's gross receipts from the Electronic Filing Service shall include any sums received by Franchisee from any other holder of a satellite franchise granted by Block for whom, with Block's approval, Franchisee acts as an agent in the conduct of said franchise holder's electronic filing service, for the transmission by Franchisee of Customer Data of said franchise holder's customers to CompuServe through use of Franchisee's hardware and Block's System, but only to the extent that such sums exceed $3.25 per tax return so transmitted by Franchisee on behalf of said franchise holder.

13.   Reports.   Within the time period after the end of each Reporting Period in which Franchisee, by the terms of each separate Satellite Franchise Agreement, is required to submit to Block reports of Franchisee's gross receipts from the preparation of income tax returns and the

Sat. Franchise Electronic Filing Agreement 7/92

6

performance of Related Services for such Reporting Period, Franchisee shall also submit to Block such reports as may be required by Block in connection with the Electronic Filing Service. Franchisee shall keep books and records relating to the Electronic Filing Service which are separate and distinct from books and records pertaining to tax return preparation, other Related Services, and any Additional Services offered to the public by Franchisee, and such books and records shall be open to inspection by Block during regular business hours.

14.   Payment Of Fees And Royalties. The Transaction Fee, Service Fee, royalties due pursuant to Section 12 herein and any processing or other fees relating to the RAL Service or the RAC Service mentioned in Section 16, below, are independent of each other and are cumulative. All of such fees and royalties shall be due and payable by Franchisee at the same times that royalties on Franchisee's gross receipts are due and payable pursuant to each separate Satellite Franchise Agreement. Time shall be of the essence as to all reports to be made to Block and all fees and royalties to be paid by Franchisee to Block. All of such fees and royalties are exclusive of sales tax, use tax, or any similar tax imposed by any unit of government. In the event that any such tax is imposed upon any such fee or royalty, or upon any transaction charges attributable to tax returns of Franchisee's customers which Block must pay to CompuServe, Franchisee agrees to pay such tax.

15.   Franchisee's Conduct Of Business. Except for the obligations of Block specified herein or in the Satellite Franchise Agreement, the operation of the Electronic Filing Service shall be solely the responsibility of Franchisee. Franchisee agrees to conduct the Electronic Filing Service in full compliance with (a) all provisions of this Agreement and the Satellite Franchise Agreement; (b) the Specifications and any other rules or regulations published by the IRS relating to the electronic filing of tax returns and the direct deposit of income tax refunds; (c) any other applicable laws, rules or regulations of any federal, state or local governmental body; and (d) the procedures, guidelines and restrictions adopted by Block for Franchisee's conduct of the Electronic Filing Service and Franchisee's use of Block's System. Franchisee acknowledges and agrees that any such procedures, guidelines and restrictions adopted by Block may, at Block's discretion, differentiate Franchisee from other H&R Block franchise owners utilizing Block's system on the basis of the optional method of use of Block's System selected by Franchisee, the location, volume history or other characteristic of Franchisee's franchise operation or the duration of Franchisee's participation in the electronic filing program.

16.   RAL Service And RAC Service. Franchisee agrees to comply with any obligations or restrictions imposed upon Block pursuant to the terms of any agreement pertaining to the RAL Service or the RAC Service to which Block and Bank are parties (the "Bank Agreement"), except to the extent otherwise expressly provided in such Bank Agreement or in the procedures, guidelines and restrictions adopted by Block for the conduct of the Electronic Filing Service. Franchisee's obligation with respect to the RAL Service and the RAC Service includes, but is not limited to, compliance with all provisions found in the Bank Agreement, Specifications, laws, procedures, guidelines and restrictions that relate to Franchisee's care, custody, handling, issuance and/or delivery of RAL or RAC disbursement checks and the processing, under appropriate circumstances, of stop payment orders relating to RAL or RAC disbursement checks. Upon termination of the Bank Agreement, Franchisee's RAL Service or RAC Service shall terminate.

Franchisee agrees to pay any RAL processing fee or other fee imposed by Bank upon Block or Franchisee for the services of Bank in processing a RAL application and/or providing a Refund Anticipation Loan to a RAL customer of Franchisee. Franchisee agrees to pay any RAC processing fee or other fee imposed by Depository upon Block or Franchisee for the services of Depository in processing a RAC request and/or providing a RAC to a RAC customer of Franchisee. In no event shall any fee paid by Franchisee pursuant to this Section 16 with respect to any customer of Franchisee's RAL Service or Franchisee's RAC Service exceed the fee which Block would be required to pay to Bank or Depository pursuant to the Bank Agreement if such customer were a customer of Block's RAL Service or Block's RAC Service.

In the event of Franchisee's failure to comply with the obligations imposed upon Franchisee in this Section 16 pertaining to Franchisee's RAL Service, Franchisee's right to use Block's System pursuant to this Agreement for purposes of providing the RAL Service to Franchisee's customers may, at Block's discretion, be terminated immediately upon written notice from Block to Franchisee of such failure.

In the event of Franchisee's failure to comply with the obligations imposed upon Franchisee in this Section 16 pertaining to Franchisee's RAC Service, Franchisee's right to use Block's System pursuant to this Agreement for purposes of providing the RAC Service to Franchisee's customers may, at Block's discretion, be terminated immediately upon written notice from Block to Franchisee of such failure.

17. <u>Modifications By Block</u>. Effective on November 1 of any renewal term, Block shall have the right to (1) eliminate or modify any of the optional methods of Franchisee's use of Block's System; (2) eliminate or modify any of the services which comprise the Electronic Filing Service; or (3) change the exact hardware configurations for hardware to be used with Block's System. If Block elects to make any of the foregoing modifications, Block shall notify Franchisee on or before August 15 of the initial term or renewal term immediately preceding the renewal term in which such modification shall become effective (which preceding initial term or renewal term shall be referred to herein as the "Preceding Term").

If (1) Franchisee utilized the eliminated or modified optional method of use of Block's System during the Preceding Term, (2) a service comprising the Electronic Filing Service during the Preceding Term is eliminated or substantially modified, or (3) the exact hardware configurations specified for use with Block's System are substantially modified and Franchisee utilized the PC Option during the Preceding Term, then Franchisee shall have the right to terminate this Agreement upon giving written notice to Block on or before August 31 of the Preceding Term.

18. <u>Exclusivity</u>. The Electronic Filing Service shall be the only electronic tax return filing service, direct deposit service, refund anticipation loan service and electronic refund service offered by Franchisee, except as may be expressly permitted by Block in writing, and Franchisee shall use no system other than Block's System, no transmission facilities other than CompuServe's communication lines, no RAL lending institution other than Bank and no RAC depository bank other than Depository in the conduct of the Electronic Filing Service.

19.    Disclaimer Of Warranties.  Block makes no representation or warranty as to the reliability or fitness of Block's System or as to the success or profitability to Franchisee of the Electronic Filing Service to be conducted hereunder by Franchisee, or that in the future the electronic filing of tax returns, the direct deposit of income tax refunds or refund anticipation loans will be permitted by the IRS or that Block will continue to offer its System for electronic filing. Block does not represent or warrant that the Block Program or any enhancement or modification thereto or their ability to process data will not be adversely affected in any way with the introduction of dates which include the year 2000.  BLOCK DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO BLOCK'S SYSTEM AND THE ELECTRONIC FILING SERVICE.

20.    Limitation Of Liability; Indemnification.  Block, CompuServe and/or their respective subsidiaries, related entities, affiliates, directors, officers, shareholders, employees, agents and successors shall not be liable to Franchisee or to any other party for any loss, damage or expense arising out of or resulting from the nonoccurrence of the conditions precedent set forth in Section 3; the performance or nonperformance of Block's System or any delay in performance of such System; any failure of Franchisee's Agent to promptly and accurately transmit Customer Data to CompuServe on behalf of Franchisee; any failure of CompuServe to perform its obligations in connection with any transmission of data; any failure of Bank, for whom Franchisee acknowledges Block is not an agent, to perform its obligations in connection with the RAL Service; any failure of Depository, for whom Franchisee acknowledges Block is not an agent, to perform its obligations in connection with the RAC Service; Franchisee's use of Block's System; or Franchisee's operation of the Electronic Filing Service.

Franchisee shall bear all responsibility and liability for the accuracy and timeliness of the Customer Data (1) transmitted by Franchisee to CompuServe, if operating under the PC Option, (2) delivered by Franchisee to Block for transmission to CompuServe, if operating under the Messenger Option, or (3) delivered by Franchisee, if operating under the Courier to PC Option, to Franchisee's Agent for transmission to CompuServe and transmitted by Franchisee's Agent to CompuServe.

Franchisee shall assume sole responsibility, and liability for, shall indemnify Block, CompuServe, Bank and Depository against, and shall hold them harmless from, any loss, cost, damage or expense (including, without limitation, the payment of penalties or interest pursuant to (i) the H&R Block guarantee described in the H&R Block Policy and Procedure Manual, or (ii) the requirements of the IRS in connection with the electronic filing of individual income tax returns) arising out of or resulting from (a) any act, error or omission committed by Franchisee or Franchisee's agents or employees in the preparation of any tax return for which the Electronic Filing Service is utilized; (b) any act, error or omission committed by Franchisee or Franchisee's agents or employees in the conduct of the Electronic Filing Service; (c) any loss, alteration, misuse or improper issuance or delivery of RAL or RAC disbursement checks, whether by Franchisee or Franchisee's agents or employees, or any third person, resulting from any occurrence after any delivery of such checks to Franchisee and prior to, or concurrent with, Franchisee's delivery of any such check to the RAL or RAC customer; (d) any act, error or omission committed by Franchisee's Agent in entering Customer Data into said Agent's computer or in transmitting such Customer Data to CompuServe; or (e) Franchisee's performance of Franchisee's obligations under this Agreement, including, but not limited to, Franchisee's obligation to

transmit to CompuServe or deliver to Block or Franchisee's Agent, as the case may be, accurate Customer Data in a timely manner.

21.  <u>Termination</u>.  This Agreement shall terminate:

a.  Immediately upon the termination of the Satellite Franchise Agreement under which any Electronic Filing Service has been conducted.  If Franchisee has operated an Electronic Filing Service under one or more separate Satellite Franchise Agreements and some, but not all, of such separate Satellite Franchise Agreements are terminated, this Agreement shall terminate by reason of this Subsection 21a only with respect to those separate Satellite Franchise Agreements that have been terminated.  If Block and Franchisee are parties to one or more addenda to the Satellite Franchise Agreement, and one or more such addenda are terminated separately from the Satellite Franchise Agreement, this Agreement and the rights granted to Franchisee herein shall terminate only with respect to the addenda which have terminated, and such terminated addenda shall no longer be considered to be a part of the Satellite Franchise Agreement for purposes of this Agreement;

b.  At Block's option, immediately upon any termination of the Computer Services Agreement between Block and CompuServe relating to the Electronic Filing Service;

c.  If Franchisee has elected the Courier to PC Option, immediately upon any termination of a separate agreement between Block and Franchisee's Agent under which Franchisee's Agent is authorized to conduct an Electronic Filing Service using Block's System in said Agent's own franchise territory or territories;

d.  On any termination date specified in a written mutual termination agreement executed by Block and Franchisee;

e.  Immediately upon (1) any denial by the IRS of acceptance of Franchisee into the electronic filing program, (2) any suspension by the IRS of Franchisee from the electronic filing program, or (3) any general refusal by the IRS to accept tax returns from Block, CompuServe, Franchisee or Franchisee's Agent for filing electronically;

f.  At Franchisee's option, in accordance with Section 17 of this Agreement;

g.  In the event of Franchisee's material and substantial breach of the terms of this Agreement, provided that, prior to such termination, Block shall provide written notice of the breach to Franchisee and, if the breach is one that is curable, Franchisee shall have 15 days from the date such notice is given to cure such breach.  If the breach is a breach which is not curable, this Agreement shall terminate immediately upon the giving of notice of the breach; or

h.  By either party hereto, at the end of the initial term or any renewal term specified in Section 1 of this Agreement, upon written notice given to the other party at least 60 days prior to the expiration of such term.

22.    Obligations Surviving Termination.  The obligations of Franchisee pursuant to Sections 5, 8, 9, 10, 11, 12, 13, 14, 16 and 20 shall continue following termination of this Agreement.

23.    Relation Of Parties.  Nothing herein shall be deemed to create any principal-agent, partnership, joint venture or relationship between the parties other than the relationship of franchisor and franchisee (and of licensor and licensee in the case of a franchisee operating pursuant to the PC Option), and neither party shall have any right or authority to incur any expense or liability whatsoever on behalf of the other party without such other party's prior written consent. Neither party shall be liable to any person whomsoever for any debts incurred by the other party.

24.    Notices.  Except as provided in this Section 24, all notices required or given hereunder shall be in writing and shall be deemed sufficiently served by mailing, postage prepaid, via certified or registered mail, with respect to Franchisee, to the address shown below, and with respect to Block, to H&R Block, 4400 Main Street, Kansas City, Missouri 64111, Attention: Mr. Christopher Meck, or to such other address(es) that may hereafter be designated by either party to the other, and shall be deemed to have been given as of the date so mailed.  Notice by Block to Franchisee pursuant to Sections 10, 11 and 17 of this Agreement shall be deemed sufficiently served by Block's mailing, postage prepaid, via first or third class mail, to Franchisee's address shown below (or to such other address(es) that may hereafter be designated by Franchisee) or publication of notice on TaxNet or the Block News Network or any other written or electronic communication containing the information concerning the specified modifications and such notice shall be deemed to have been given by Block as of the date such publication or other written communication is so mailed or transmitted.  Notice required under Section 17 shall be given on or before August 15 and for Sections 10 and 11 on or before December 1 of the Preceding Term.

25.    Integration And Amendments.  This Agreement, any executed addenda hereto, and the related provisions of any separate Satellite Franchise Agreement under which an Electronic Filing Service is to be conducted express fully the understanding and agreement of the parties hereto with respect to Franchisee's use of Block's System for the conduct of the Electronic Filing Service, and all prior understandings or commitments of any kind, whether oral or written, concerning the Electronic Filing Service or any other matter covered by this Agreement are hereby superseded and cancelled, with no further liabilities or obligations of the parties with respect thereto except as to (a) any monies due and unpaid between the parties to this Agreement at the time of the execution of this Agreement and (b) any liabilities or obligations which survive the termination of any prior Satellite Franchise Electronic Filing Agreement between the parties hereto by the express terms of such prior Agreement.  Except as provided in Sections 2 and 17, this Agreement may not be amended or modified other than by a written agreement executed by both parties.

26.    Partial Invalidity.  If any provision of this Agreement shall be determined to be invalid, illegal or incapable of being enforced by reason of any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect, and no provision of this Agreement shall be deemed to be dependent upon any other unless so expressed herein.

27.   <u>Waiver</u>.  No waiver of any term or condition of this Agreement shall be valid unless in writing and signed by the party to be bound thereby.  No waiver of any term or condition hereof with respect to any act or event shall be deemed to be a waiver of such term or condition with respect to any subsequent act or event.

28.   <u>Applicable Law</u>.  This Agreement shall be construed according to the laws of the State of Missouri unless any rule of law or public policy of the state in which the Electronic Filing Service is conducted requires that this entire Agreement, or a specific provision hereof, be governed by the laws of such state.

29.   <u>Binding Effect; Assignability</u>.  This Agreement shall be binding upon and enure to the benefit of the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal representatives, provided, however, that this Agreement may not be assigned by Franchisee, by operation of law or otherwise, without the prior written consent of Block.  This Agreement shall not be binding on either Block or Franchisee until it has been executed by Franchisee and an executive officer of Block.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

H&R BLOCK ___EASTERN_____
TAX SERVICES, INC.

By _____
             Vice President

_____
             Franchisee

_____1290 Hwy 196_____
             Address

_____Collierville, TN     38017_____
City                              State    Zip Code

**H&R BLOCK**

# CONTRACT PROCEDURE
# SATELLITE FRANCHISES

Region Number _2 2_                                      Date _1-9-8(?)_

This form is to be completed and forwarded to Corporate Headquarters in every instance that there is a change in status of an existing contract with a satellite franchise, and whenever a new contract is signed by any satellite franchises or major franchises. A separate 2320 must be submitted for each cancellation and each new agreement, except when using transfer forms. It is not necessary to process a separate 2320 cancelling the previous agreement when transfer forms and a new agreement are used (U.S. only).

## CONTRACT INFORMATION

City _Collierville_ State/Province _Tn._ County _Shelby_ Zip/Postal Code _38017_ Location Code No. _99 848_

Population _4 m_        Contract Issued To _Phillip A. Murphy_        Contract Date _11-30-84_

## WHY IS FORM BEING PREPARED?

| | | |
|---|---|---|
| ____ New Contract | ____ Resatellite | ____ Sale |
| ____ Request new Location Code No. | ____ Conversion | ____ Replacement |
| _X_ Other _Bookkeeping Assistance_ | ____ Sale by Block | ____ Conversion S-B/CS-B |

Cancellation (Eff. Date _____)

Transfer To: ____ Individual
____ Controlled Entity
____ Non-controlled Entity

## CHECK LIST

YES   NO

1. Has there ever been a previous contract on this city? ____
   If "yes", has old contract been □ cancelled □ transferred? Name of previous holder ____
   If cancellation, what is the reason contract is being cancelled (i.e., sale, gave back to H&R Block, cancelled by franchisee, cancelled for cause by Block, etc.)? ____

2. Has contract holder on new contract ever had a previous contract with H&R Block? ____
   a. If "yes", has previous contract been cancelled? ____
   b. Give the (1) city, (2) region number, (3) positions held on previous contracts.
   City ____ Region Number ____ Position ____

3. Is contract holder a relative of any full-time employee of H&R Block? ____
   If "yes", relationship ____ District of Employment ____

4. Is contract holder a relative of any other satellite franchise owner? ____
   If "yes", relationship ____ City ____

## TYPE OF CONTRACT (Check One)

Major Franchise ____ Franchise Satellite ____ CO Satellite _✓_ Sat. Branch Office ____ Branch Office of ____ Location Code ____

Deposit received ____ * Date ____ Contract Form No. _5-8_ If satellite, parent district _W. Memphis_ Location Code _85 758_

* If deposit check is for more than one satellite contract, please indicate   TRANSFER DEPOSIT:        Tax Season Returns

From: ____ City ____ Location Code

To: ____ City ____ Location Code     Tax Season Volume

## APPROVED BY

Regional Director _LL_        Date _1-9-87_

Corporate Headquarters _CKM_        Date _1-19-87_

## CORPORATE HEADQUARTERS USE ONLY

Cancellation on previous contract holder received ____

New contract or transfer forms received for ____ Effective transfer date ____

## GENERAL INSTRUCTIONS

The Satellite Franchise owner signs four copies of the contract and the Satellite Director forwards the contracts to the Regional Director; the Regional Director prepares the translucent form 2320 and forwards the translucent of the 2320 to Corporate Headquarters along with the contracts. Corporate Headquarters will process the contracts and return signed contracts to the Regional Director for forwarding to the Satellite Franchise owner and Satellite Director.

## CHECK LIST FOR ENCLOSURES

| R.D. or D.D. | Corp. Hdq. | Satellite Contract | R.D. or D.D. | Corp. Hdq. | Branch Office of Satellite |
|---|---|---|---|---|---|
| □ | □ | Deposit Check | □ | □ | Deposit Check |
| □ | □ | Down Payment (if sale by Block) | □ | □ | Down Payment (if sale by Block) |
| □ | □ | Business Ins. Check/Card | □ | □ | Business Ins. Check/Card |
| □ | □ | Personal Qualifications Summary | □ | □ | Satellite Approval Worksheet (if new branch) |
| □ | □ | Form 2327 | □ | □ | Receipt Page |
| □ | □ | Receipt Page | □ | □ | Letter of Resignation, Abandonment, etc. |
| □ | □ | Letter of Cancellation, Abandonment, etc. | □ | □ | S-8-1 Addendum |
| □ | □ | Form S-C1/CS-C1 (if converting to new contract forms) | | | |
| □ | □ | Transfer Forms | | | |
| □ | □ | S-8 Agreement | | | |
| □ | □ | Satellite Approval Worksheet (if new city) | | | |

2320S-4-85

### AMENDMENT TO SATELLITE FRANCHISE AGREEMENT

THIS AMENDMENT is made and entered into this _3rd_ day of _Jan._, 19_87_, between H&R BLOCK

(_____), INC., a __Missouri_____ corporation ("Block"), and

_____Phillip A. Murphey_____

("Franchisee").

In consideration of the covenants and agreements herein contained, Block and Franchisee agree that the Satellite Franchise Agreement which they executed as of __November 30__, 19_84_, for the Franchise Territory defined and described therein as the City of __Collierville_____, in the County of __Shelby_____ and the State of __Tennessee_____ (hereafter referred to as the "Satellite Franchise Agreement"), shall be modified and amended as follows:

1. That, notwithstanding the provisions of paragraph 10 of the Satellite Franchise Agreement, Franchisee may hereafter conduct a bookkeeping business from the office required to be maintained under said paragraph regardless of whether or not Franchisee conducted the bookkeeping business on the date of the Satellite Franchise Agreement.

2. For purposes of determining Franchisee's obligation to pay to Block royalties on gross receipts from services provided by Franchisee, tax return preparation services shall be distinguished from bookkeeping services in accordance with the definitions and criteria set forth in the Manual. With respect to tax return preparation services provided by Franchisee to customers of Franchisee's bookkeeping business, (a) Franchisee shall use the tax forms supplied to Franchisee by Block; (b) Franchisee shall charge such customers separate fees for tax return preparation services and bookkeeping services; (c) H & R Block receipts shall be issued by Franchisee to such customers setting forth the fee for such tax return preparation services and copies of such receipts shall be submitted to Block in accordance with the provisions of paragraph 6 of the Satellite Franchise Agreement; (d) payments received from such customers for the preparation of tax returns shall constitute "Gross Receipts," as said term is defined in the Satellite Franchise Agreement and royalties shall be paid on such Gross Receipts in accordance with paragraph 6 of the Satellite Franchise Agreement.

3. Franchisee shall not conduct Franchisee's bookkeeping business under the "Licensed Marks," as such term is defined in the Satellite Franchise Agreement.

4. During and after the term of the Satellite Franchise Agreement, Franchisee will indemnify and hold harmless Block from and against any and all loss, damage, liability, expense (including reasonable attorneys' fees) and cost of any kind or nature, arising out of or in connection with Franchisee's bookkeeping business.

5. Except as specifically modified and amended herein, all of the terms, conditions and provisions of the Satellite Franchise Agreement shall continue in full force and effect.

6. Except as limited by paragraph 16 and related provisions of the Satellite Franchise Agreement, this Amendment shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, executors, administrators, and legal representatives of the parties hereto.

7. This Amendment shall not be binding on Block unless and until this Amendment has been executed by Franchisee and by an executive officer of Block (that is, the President, Executive Vice President, or any Vice President of Block), and attested to by its Secretary or Assistant Secretary.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

_Phillip A. Murphy_____
(Franchisee)

H&R Block (_____), Inc.
(Block)

By _____ _VP._       __Route 4_____
   (Name and Office)                        (Franchisee's Address)

By _____              __Coldwater, MS_____
   Assistant Secretary                         (City, State)

**FRANCHISE CONTRACT PROCEDURES**

Region Number _04_                                      Date _12-9-99_

This form is to be completed and forwarded to World Headquarters in every instance where there is a change in status of an existing contract with a franchise, or whenever a new contract is signed by a franchise or major franchise. A separate 2320S must be submitted for each cancellation and each new agreement, except when using transfer forms.

**CONTRACT INFORMATION (Please type or print)**

City _Collierville_   State _TN_   County _____   Zip _38017_   Admin. Dept. ID _39950_   Office Dept. ID _____

Branch (1) _____ State ____ Office Dept. ID _____   Branch (2) _____ State ____ Office Dept. ID _____

Population _____ Contract Issued To _Mary Ellen Murphy_   Contract Date _____

**WHY IS FORM BEING PREPARED?**

____ New Contract                 ____ Sale by Block         ____ S 8-2              Transfer To:  ____ Individual
____ New Branch                   ____ Refranchise           ☐ additional location                 ____ Controlled Entity
____ Request for new Admin. Dept. ID  ____ Replacement            or                                 ____ Non-controlled Entity
____ Electronic Filing Agreement  ____ Cancel TPS agreement only   ☐ Relocation of      ____ Cancellation (Eff Date: _____)
____ Conversion to                ____ Cancel EF agreement only   existing office     Inactivate the Admin. ID?
____ Sale                         _✓_ Other                                              ☐ Yes   ☐ No

_Financial Products License Agreement_

| YES | NO | |
|---|---|---|
| ____ | ____ | 1. Has there ever been a previous contract on this city? |
| | | If "yes", has old contract been ___ cancelled ___ transferred? Name of previous holder _____ |
| | | If cancellation, what is the reason contract is being cancelled (i.e., sale, gave back to H&R Block, cancelled by Franchisee, cancelled for cause by Block, etc.)? _____ |
| ____ | ____ | 2. Has Contract holder on new contract ever had a previous contract with H&R Block? |
| | | a. If "yes", has previous contract been cancelled?   City _____ Region Number _____ |
| ____ | ____ | 3. Is contract holder a relative of any full-time employee of H&R Block? If "yes", relationship _____ |
| | | District of Employment _____   Position _____ |

**ADDITIONAL INFORMATION (CHECK ONE AND COMPLETE APPLICABLE LINES)**

Major Franchise ___ MF Franchise ___ GO Franchise _✓_ State, Branch Office ___ Branch Office of _____ Admin. Dept. ID _____

Deposit Received $ _____ Date _____ Contract Form No. _____

Parent District _ATM_ _____ Admin. Dept. ID _____ Franchise Director _Sherry Thomas_

*If deposit check is for more than one franchise contract, please explain on line below:   **TRANSFER DEPOSIT:**

From: _____
         City          Admin. Dept. ID    Amount

Previous Tax Season: Returns _____ Volume _____   To: _____
                                                           City          Admin. Dept. ID    Amount

**APPROVED BY**

Regional Franchise Director _John Leeway_ _Robin Wheeler_   Date _12-15-99_
World Headquarters _____                          Date _12-16-99_

**World Headquarters USE ONLY**

Cancellation on previous contract holder received _____

New contract or transfer forms received for _____   Effective transfer date _____

**GENERAL INSTRUCTIONS**

The prospective Franchisee signs four copies of the contract, related paperwork, and the completed 2320S to the Regional Franchise Director. The Regional Franchise Director reviews the contracts, indicates approval by signing Form 2320S and forwards the original to World Headquarters along with the contracts. World Headquarters will process and return the signed contracts to the Regional Franchise Director for forwarding to the Franchise owner and Franchise Director.

| World R.D. Hdqrts **Franchise Contract** | | World R.D. Hdqrts **Rapid Refund/Automation** | | World R.D. Hdqrts **Branch Office of Franchise** | |
|---|---|---|---|---|---|
| ☐ ☐ Deposit Check | | ☐ ☐ Rapid Refund Info. Worksheet | | ☐ ☐ Deposit Check | |
| ☐ ☐ Down Payment (if sale by Block) | | ☐ ☐ Electronic Filing Agreement | | ☐ ☐ Down Payment (if sale by Block) | |
| ☐ ☐ Business Insurance Card | | ☐ ☐ ACH Bank Info. | | ☐ ☐ S-8-1 Addendum | |
| ☐ ☐ Personal Qualifications Summary | | ☐ ☐ Change of Option | | ☐ ☐ Royalty Addendum | |
| ☐ ☐ Form 2327 | | From ___ To ___ | | ☐ ☐ New TPS Agreement | |
| ☐ ☐ Receipt Page (if applicable) | | ☐ ☐ TPS Addendum | | ☐ ☐ Form 2327 | |
| ☐ ☐ Letter of Resignation, Abandonment, etc. | | ☐ Product Addendum | | ☐ ☐ Business Insurance Card | |
| ☐ ☐ Transfer Forms | | ☐ Mortgage Agreement | | ☐ ☐ Franchise Approval Worksheet (if new branch) | |
| ☐ ☐ S-8 Agreement | | ☐ Agri Plan Addendum | | ☐ ☐ Receipt Page (if applicable) | |
| ☐ ☐ Franchise Approval Worksheet (if new city) ☐ | | ☐ Form 2104 (e-mail account) | | ☐ ☐ Letter of Resignation, Abandonment, etc. | |
| ☐ ☐ S-8-2 Agreement | | | | | |
| ☐ ☐ FELC Clearance Letter | | | | | |
| ☐ ☐ Form 2600 (shipping address change) | | | | | |

2320S-7-99

Admin. I.D.: 39950

# FINANCIAL PRODUCTS LICENSE AGREEMENT

THIS AGREEMENT is made and entered into this _3_ day of _Dec 1999_, between H&R Block Tax Services, Inc., a Missouri corporation ("Block"), and _MARY ELLEN MURPHY_ of _358 New BYHALIA Rd Ste 1_
(Name)                                            (Number & Street or Box Number)
_Collierville_ , _Tn_   _38017_ ("Licensee").
(City)                 (State)     (Zip)

## Recitals

Licensee and Block are parties to an agreement (the "Satellite Agreement") under which Licensee is permitted to use the name "H&R Block" and certain other marks to perform tax preparation and other related services from a location or locations within _Collierville, TN_ (the "Franchise Territory").

Block desires to arrange for the delivery of financial products originated from the Franchise Territory and Licensee desires to operate a financial products business (the "Business") under Block's marks at one or more of the office locations in the Franchise Territory at which Licensee operates a business under the Satellite Agreement.

## Agreement

In consideration of the foregoing and the agreements set forth below, Block and Licensee (collectively, the "Parties") agree as follows:

1.   **Grant of License.**  Block grants to Licensee a license to use during the term of this Agreement the name "H&R Block" in the manner specified by Block and such other names or services marks that Block may from time to time permit or require Licensee to use in the financial products business (the "Licensed Marks") to operate the Business from the location(s) in the Franchise Territory (the "Office Locations") set forth in Schedule One, below. Licensee's operation of the Business under this Agreement at any additional locations is subject to Block's prior written approval, which approval (which will be deemed an amendment to Schedule One without further action by the Parties) shall not be unreasonably withheld. Licensee may advertise or promote Licensee's Office Locations only in media originating within the Franchise Territory, but Licensee may conduct the services permitted under this Agreement at such locations for any person or firm residing outside the Franchise Territory.

2.   **Relationship With Broker Dealer.**  Licensee shall enter into an agreement with only such broker dealer(s) as designated in writing by Block (the "Broker Dealer") and comply with the terms and conditions of any such agreement with the Broker Dealer (the "Broker Dealer Agreement"). For the purposes of this Agreement, the services and products that Licensee is authorized to offer under the Broker Dealer Agreement are referred to as "Financial Products," which include sales of securities, investment advisory services and variable and fixed insurance products. The grant of license under this Agreement is limited to only Financial Products and Licensee shall not permit the Business to engage in any activity at the Office Locations other than offering Financial Products and such other products and services that Licensee may be permitted or required to offer at such locations under other agreements with Block.



**EXHIBIT**
_D_

Financial Products Lic. Agmt. (9/99)

3.    Exclusivity.  During the term of this Agreement, Block will not operate on its own or through others a business offering Financial Products under the Licensed Marks, under the name and mark "H&R Block" or under any similar name or mark at retail locations in the Franchise Territory. However, during such term, Block, on its own or through others, may use such marks to offer Financial Products to customers in the Franchise Territory through the Internet, direct mail, outbound telemarketing or any other media.

Twenty (20) days prior to the commencement of any such offer, Block shall provide Licensee notice of any such direct mail or outbound telemarketing (collectively, "Solicitation") offers; provided, however, that Block is not required to notify Licensee of Internet offers (Internet offers are not included in the term "Solicitation") which may be made by Block without obligation to Licensee. In the event of any such Solicitation during the term of this Agreement, Block shall use its best efforts to provide Licensee with the names and related information for all interested prospective customers resulting from such Solicitation in the Franchise Territory to enable Licensee to contact such prospective customers for future business.

Both during and after the term of this Agreement, without obligation to Franchisee, Block on its own or through others may offer any Financial Products under marks other than the Licensed Marks or "H&R Block" at retail locations or otherwise in the Franchise Territory.

4.    Licensee's Conduct of Business.  Licensee shall use Licensee's best efforts in operating the Business and shall at Licensee's expense manage and conduct such Business in accordance with the Broker Dealer Agreement and rules specified as applicable to Licensee in Block's Policy and Procedure Manual as may be amended by Block from time to time (the "Manual") and as applies to a Financial Products business. Without limiting the generality of the foregoing, Licensee shall:

(a)    Maintain a neat and orderly office or offices of professional appearance which meet the standards set forth as applicable to Licensee in the Manual (such standards shall be no greater than the standards applicable to Financial Products offices operated by Block or its affiliates), including, without limitation, properly identified signs approved in advance by Block and adequate space for conducting the Business;

(b)    Upon termination of this Agreement for any reason other than due to the default of Block, surrender to Block all Licensee's Customers files and transfer to Block or a third party designated by Block all Licensee's Customers accounts, including any trailer fees associated with such accounts; and

(c)    Require and cause each person engaged in the Business as a sales representative for any Financial Product to be licensed through a broker dealer designated by Block and require that each such person, or any person engaged in a supervisory capacity in the Business, execute an agreement, in the form prescribed by Block, containing, among other things, such non-competition and non-solicitation covenants as prescribed by Block. Licensee shall be licensed at the same or a higher level than such persons.

Licensee (or the "Principal" designated under this Agreement if Licensee is a corporation, partnership or other legal entity) shall directly oversee the day-to-day affairs of the Business offered at the Office Locations unless Licensee employs a general manager, approved in writing by Block.

5.    Use of Licensed Marks.  Licensee shall operate the Business under the Licensed Marks. Licensee acknowledges that the use of any other name or mark in conducting the Business is prohibited, that the Licensed Marks will be used only in connection with the Business and in the manner specified by Block and that Licensee shall not permit the Licensed Marks, or any substantially similar style or spelling

Financial Products Lic. Agmt. (9/99)

thereof (including, but not limited to, the name and mark "H&R Block" and the word "Block"), to be used for any other purpose, including, but not limited to, the formation of corporations, partnerships or any other form of business organization, without the prior written permission of Block.

Block must approve in writing Licensee's use of the Licensed Marks in any advertising or marketing prior to such use. In the event Block modifies or replaces any Licensed Mark, Licensee must modify or replace any signs or materials to reflect the new Licensed Mark.

All uses of the Licensed Marks shall inure to the benefit of Block, and Licensee shall not at any time acquire any rights in the Licensed Marks by virtue of any use thereof. Upon termination of this Agreement, Licensee shall immediately cease using the Licensed Marks.

Licensee agrees that the nature and quality of the Business offered by Licensee under the Licensed Marks and all related advertising, promotion and other uses of the Licensed Marks shall conform to standards set by Block. Licensee shall permit reasonable inspection of Licensee's operation, notify Block of any regulatory complaints with the Business, and, if requested, supply Block with specimens of all uses of the Licensed Marks prior to the distribution of any items utilizing the Licensed Marks.

6.  **Term.** The term of this Agreement begins on the latter of the date hereof or the date Licensee enters into the Broker Dealer Agreement and shall run concurrently with the term of the Broker Dealer Agreement, unless terminated sooner as provided herein.

7.  **Indemnification.** Licensee shall be responsible for all loss or damage arising out of or relating to the operation of the Business under this Agreement. Licensee shall indemnify, defend and hold harmless Block and each of its respective affiliates and their respective officers, directors, employees and agents from and against any and all loss, damage, liability, expense (including reasonable attorneys' fees) and costs of any kind or nature, not occasioned by the fault or neglect of Block, arising out of or in connection with Licensee's operation of the Business under this Agreement or the breach of this Agreement by Licensee. Block shall indemnify, defend and hold harmless Licensee from and against any and all loss, damage, liability, expense (including reasonable attorneys' fees) and costs of any kind or nature arising out of or in connection with the breach of this Agreement by Block or a loss which occurs by reason of the fault or neglect of Block. The provisions of this Section 7 shall survive termination of this Agreement.

8.  **Books and Records; Inspections.** Licensee shall maintain for a period of at least three (3) years after their creation (or such longer period as may be required by law) full, complete and accurate books and records pertaining to the Business, including, but not limited to, copies of all customer files and receipts, and any and all other reports, documents and records required to be filed with any governmental authority or maintained pursuant to any federal, state or local law or regulatory body. Block or its representatives shall have the right from 9 a.m. to 5 p.m., Monday through Friday, throughout the year, to inspect any Office Location for the purpose of (i) examining the books and records required to be maintained hereunder; (ii) observing the manner and method of Licensee's operation; and (iii) otherwise assuring itself that Licensee is in compliance with the provisions of this Agreement. Block shall give Licensee at least 48 hours' notice of such inspection. Unless permitted to do so by Licensee, Block shall not disclose to a third party or to any affiliate of Block that offers Financial Products any customer information obtained from Licensee.

9.  **Limitations on Competition and Disclosure.** Licensee agrees that:

    (a)  During the term of this Agreement Licensee will not directly or indirectly (whether as owner, stockholder, partner, officer, director or employee) compete with Block in the business of selling

Financial Products Lic. Agmt. (9/99)

Financial Products in or within 45 miles of the Franchise Territory, in the territory granted to any other Block licensee, or within 45 miles of any Financial Products office operated by Block;

(b) For a period of two (2) years after the transfer, expiration or termination of this Agreement for any reason (such period to be extended by any period(s) of violation), Licensee shall not directly or indirectly (whether as stockholder, partner, officer, director or employee) (i) solicit by mail, phone or in person, or divert from Block or Block licensees any person to whom Financial Products were offered at any time during the term of this Agreement pursuant to the Business; or (ii) compete with Block or Block licensees in the business of selling Financial Products in or within 45 miles of the Franchise Territory;

(c) If the scope of any restriction contained in this Section 9 is too broad to permit enforcement of such restriction to its full extent, such restriction shall be enforced to the maximum extent permitted by law, and such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction; and

(d) If Licensee violates the provisions of this Section 9, such violation would cause irreparable injury to Block, Block's remedy at law for such violation would be inadequate, and temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision hereof, without the necessity of proof of actual damage.

10. <u>Termination</u>. Either Party upon written notice to the other Party may terminate this Agreement upon the material failure of a Party to perform that Party's obligation under this Agreement and such failure is not cured within thirty (30) days after receiving notice of such failure from the non-breaching Party. This Agreement shall terminate upon termination of the Broker Dealer Agreement by either Party. Block may terminate this Agreement immediately (without opportunity to cure) upon termination for any reason of the Satellite Agreement or transfer of such Satellite Agreement unless this Agreement is also transferred to the transferee of such Satellite Agreement as permitted by Section 13(d) this Agreement.

11. <u>Notices</u>. All notices required or allowed by this Agreement shall be delivered in person, by third party courier (including overnight courier services such as Federal Express) or by certified mail, return receipt requested, postage prepaid, addressed to the Party or person to whom notice is to be given, at the following addresses:

<blockquote>

To Block:  H&R Block Tax Services, Inc.
      4400 Main Street
      World Headquarters
      Kansas City, Missouri 64111
      Attn: Vice President, Franchise Operations

To Licensee: To the name and address shown in the first
      paragraph of this Agreement. If Licensee is a
      corporation or partnership, such notice shall be
      sent to the attention of the "Principal."

</blockquote>

Any notice will be deemed given upon its receipt by the party to whom it is addressed.

12. <u>Corporation or Partnership as Licensee</u>. Block may in its sole discretion permit a corporation, partnership or other legal entity to execute this Agreement as Licensee. The individual named below as the Principal of such Licensee, to induce Block's execution of this Agreement, hereby personally

assumes and agrees to be bound by and to faithfully perform all of the terms, covenants, conditions and obligations incumbent upon Licensee under this Agreement.

13.    Miscellaneous.

(a)    Amendments.  No amendment to this Agreement is effective without the prior written agreement of both Parties.

(b)    Applicable Law.  This Agreement is to be governed by, construed under, and enforced and interpreted in accordance with the laws of the State of Missouri.

(c)    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and replaces any previous financial products business agreement between Licensee and Block or any affiliate of Block.  No waiver of any provision hereof will be valid or binding on the Parties hereto, unless such waiver is in writing and signed by or on behalf of the Parties hereto, and no waiver on one occasion shall be deemed to be a waiver of the same or any other provision hereof in the future.

(d)    Successors and Assigns: Assignability.  The provisions of this Agreement shall inure to the benefit of and be binding upon the successors, legal representatives and assigns of the Parties hereto.  Notwithstanding the foregoing, Licensee is prohibited from assigning or subfranchising Licensee's obligations hereunder without the prior written consent of Block; provided, however, if the Satellite Agreement is assigned to an approved assignee, this Agreement also may be assigned to that assignee unless regulatory or other legal requirements prevent that assignee from obtaining any licenses required hereunder.  This Agreement shall terminate in the event of the death or incapacity of Licensee if Licensee is an individual.

(e)    Severability.  If a court, governmental agency or other entity of competent jurisdiction declares any provision or part of this Agreement void, the remaining provisions or parts of this Agreement shall remain in full force and effect.

(f)    Parties Not Joint Venturers.  The Parties are not and shall not be construed as joint venturers, partners, agents or employees of each other, and neither Party shall have any power to bind or obligate the other, and neither Party shall be liable to any person whomsoever for any debts incurred by the other.

(g)    Limitation in the Event of Litigation.  The Parties hereby waive trial by jury in any action, proceeding or counterclaim, whether at law or in equity, in any matter arising out of or in any way connected with this Agreement.  All litigated disputes shall be tried to the court sitting without a jury.  Further, the Parties waive, to the fullest extent permitted by law, any right to, or claim for, punitive damages against the other in any litigated or arbitrated dispute.  In the event of any dispute, each Party shall be limited to the recovery of actual damages.

(h)    Time of the Essence.  As to all reports and fees payable to or to be made to Block, time shall be of the essence.

(i)    Section Headings.  Section and subsection headings herein are used for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

5

Financial Products Lic. Agmt. (9/99)

(j)    Block's Performance by Its Affiliates.  Any services to be performed by Block under this Agreement may be performed by any affiliate of Block.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the day and year first above written.

H&R Block Tax Services, Inc.                        Licensee (if an individual)

By:                                                _____
_____                   Signature
Kenneth E. Treat, Jr.
Vice President


Licensee (if a corporation, partnership            Principal
        or other legal entity)

By:                                                _____
_____                   Signature
Signature


_____                   _____
Printed Name                                       Printed Name

_____                   _____
Title                                              Title


SCHEDULE ONE

Financial Products Lic. Agmt. (9/99)

## INDEPENDENT CONTRACTOR AGREEMENT
### (Franchise Owners and Sub-Reps)

**THIS AGREEMENT** ("Agreement") is made and entered into this _22_ day of _December_, 1999; by and between Birchtree Financial Services, Inc. ("BTFS"), an Oklahoma corporation with it s principal business located at 920 Main Street, Suite 216, Kansas City, Missouri 64105 and _Mary Ellen Murphy_ ("Representative") with a mailing address of _358 New 'BYHALIA RD 1_____
_Collierville Tn 38017_
### WITNESSSETH:

**WHEREAS,** BTFS is a member of the National Association of Securities Dealers, Inc. (the "NASD") and duly licensed in several states of the United States to sell and generally deal in certain types of securities; and

**WHEREAS,** the Representative desires to become an independent contractor of BTFS; and

**WHEREAS,** BTFS desires to engage the Representative as an independent contractor of BTFS on the terms and conditions set forth herein;

**NOW THEREFORE,** in consideration of the foregoing and the mutual covenants contained herein, and for such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.   <u>Engagement of Representative</u>.  Subject to the terms and conditions hereof, BTFS hereby authorizes and engages Representative to offer and solicit the sales of securities, investment advisory services, and variable and fixed insurance products (the "Products) as an independent contractor through BTFS, and Representative hereby accepts such engagement.

2.   <u>Conditions to Engagement</u>.  BTFS's engagement of the Representative is conditioned upon the following:

   a)   Representative not acting for the benefit of BTFS in any other business capacity other than in the general securities, investment advisor and insurance business;
   b)   Representative being registered as appropriate with the NASD as a registered representative or principal, and licensed or registered with any state in which Representative solicits the purchase or sale of Products; and
   c)   Representative not maintaining a dual registration with any other broker/dealer or investment advisor.

3.   <u>Relationship Between the Parties</u>.  Representative and BTFS agree that Representative is an independent contractor and not an employee of BTFS and shall not be considered to have "employee" status with respect to BTFS for any purpose. Representative agrees that he shall be responsible for (a) establishing his own place of business; (b) leasing or owning all required equipment; and (c) all costs and expenses associated with conducting Representative's business.  Representative shall not hold himself out to the public, whether orally or in writing, as an employee of BTFS including, without limitation, making a statement to such effect on stationery or business cards or in correspondence or otherwise.  Representative recognizes and

agrees that Representative is liable for the payment of all contributions, taxes and other payments or charges required to be paid by an employer with respect to compensation paid and to be paid to Representative's employees under all applicable laws, rules and regulations.

4. <u>Term of Engagement</u>. The term of Representative's engagement shall begin on the date hereof and shall continue until terminated by either party as provided for herein. This Agreement may be terminated by either party at any time, effective upon 30 days notice to the other party, for any reason whatsoever, with or without cause; provided, however, that BTFS may terminate this Agreement immediately in the event representative violates the terms hereof.

5. <u>Compensation</u>. Representative's sole compensation under this Agreement shall be a commission equal to the broker/dealer commissions, concessions or fees received by BTFS associated with amounts invested by any clients of Representative, less certain amounts retained by BTFS, all as determined in accordance with Schedule A attached hereto, as the same may be amended from time to time at the sole discretion of BTFS. Commissions shall be payable by BTFS to Representative in accordance with BTFS's practices, which may change from time to time in the sole discretion of BTFS, and commissions shall not be considered earned by Representative until received by BTFS. Except as otherwise set forth herein, no commissions shall be earned before or after the term of this Agreement. Any commissions due to the Representative will be automatically forfeited by Representative unless all documents and paperwork required by BTFS are received in a manner acceptable to BTFS within 30 days after execution of the transaction. Any commissions generated by the Representatives as a result of a sale in any state that Representative or BTFS is not registered will be automatically forfeited by Representative.

6. <u>Covenants of Representative</u>. Representative hereby covenants and agrees as follows:

   a) not to conduct any business activities contemplated hereunder unless Representative is in all respects fully licensed as required by law to conduct such activities;

   b) to pay all expenses incurred in connection with Representative's business, including but not limited to public liability and errors and omissions insurance, to be conducted in accordance with the provisions hereof;

   c) to strictly comply with all applicable statutes, rules and regulations of the SEC, NYSE, NASD, all applicable departments of insurance, the various states in which BTFS offers, purchases or sells Products and any other applicable jurisdiction or self-regulatory organization in or through which BTFS or Representative is registered, licensed or governed;

   d) to comply with and abide by all of the policies and rules included in the policy and procedures manuals of BTFS, as the same may be amended from time to time;

   e) to execute, deliver and comply with requests for any and all documents reasonably requested by BTFS in connection with Representative's engagement hereunder, including, without limitation, confidentiality agreements, compliance with BTFS procedures and requests for information;

   f) to maintain and operate an office open for a minimum of 30 hours a week on a year-round basis;

g)     to obtain consents as may be required by 26 U.S.C. Section 7216 and Treasury Regulation Section 301.7216-3(b) with respect to the use and disclosure of tax return information of the Representative's tax return customers;

h)     to obtain written approval of BTFS for all letterhead, signs, business cards or other indicia of business prior to using the same;

i)     to not maintain a dual registration with any other broker/dealer or investment advisor without the prior written approval of BTFS;

j)     to inform BTFS immediately in writing in the event that Representative or BTFS becomes the subject of any formal or informal inquiry, investigation or order by any state, federal, self-regulatory body, arbitration panel or court, or if Representative is put on notice of any complaint, dispute, violation or other legal action, whether oral or in writing, concerning Representative, BTFS or any other person doing or potentially doing business with Representative or BTFS; and

k)     upon BTFS's request, to provide BTFS with information regarding any subject which relates to Representative's or any other person's compliance with applicable securities laws, BTFS policies and procedures or any provision of this Agreement and to provide BTFS with all records in Representative's possession with respect thereto.

7.     <u>Training and Other Assistance</u>. From time to time, BTFS or its designee may provide Representative and its employees with such training as BTFS, in its sole discretion, deems reasonably necessary to conduct the business contemplated hereunder. Representative shall be responsible for the cost of attending such training, including without limitation, cost of travel, room and board. BTFS or its designee may also furnish all promotion, advertising and marketing materials deemed advisable by it in its sole discretion.

8.     <u>Computer Equipment and Software</u>. BTFS or its designee will make available to each franchise owner at no charge one computer software unit (and any enhancements or revisions thereto) specifically designed for the business contemplated hereunder and which BTFS deems reasonably necessary, and Representative agrees to use the software in such business in the manner specified by BTFS. Such software shall remain the property of BTFS or its designee and shall be used only in accordance with the specific terms of the license agreement entered into by BTFS or its designee. Representative agrees to execute any license agreement for the software as requested by BTFS or its designee. The parties agree that BTFS, in its sole discretion, may designate other computer equipment and/or software for use in the business contemplated hereunder from time to time, and that the Representative will be responsible for the costs associated therewith.

9.     <u>Trade Secrets</u>. Representative acknowledges that, by reason of its relationship with BTFS, Representative may acquire knowledge of and/or be entrusted with unique information not generally available to the public pertaining to the business methods, processes and procedures of BTFS, its parents and affiliates, which constitute confidential information. This confidential information includes, without limitation, plans, strategies, financial results, financial plans, lists, computer disks, computer software programs, computerized or Internet-based data, files and documents ("Trade Secrets"), the confidential nature of which Representative hereby acknowledges. In consideration of BTFS, its parents or affiliates providing such information,

Page 3 of 7

Representative agrees to keep and maintain the confidentiality of any an all Trade Secrets as the property of BTFS, its parents or affiliates. Representative shall not, during or after the termination of this agreement, (i) directly or indirectly possess, retain, remove or use or permit others to access, possess, retain, remove or use any Trade Secrets, whether for the purpose of competing directly or indirectly with BTFS, its parents, affiliates or otherwise; (ii) make copies of, reproduce or remove any Trade Secrets or confidential business information (in any form or format) of BTFS, its parents, affiliates or clients; (iii) directly or indirectly make known, divulge or communicate to any person or entity any such Trade Secrets or confidential business information; or (iv) use such confidential business information for any reason other than to enable Representative to properly and completely perform duties hereunder except as required for the benefit of BTFS. This covenant of confidentiality of Trade Secrets shall survive the termination of this Agreement.

10.   Regulatory Compliance. Representative acknowledges that if any dispute arises between BTFS and Representative as to whether Representative is in compliance with any applicable statutes, rules or regulations or the SEC, NYSE, NASD, all applicable departments of insurance and any other jurisdiction or self-regulatory organization in or through which BTFS or Representative is registered, licensed or governed, the decision of BTFS with respect thereto shall be determinative. In the event that BTFS determines, in its sole discretion, that Representative has violated or failed to comply with any of the aforementioned statutes, rules or regulations of the Written Supervisory Procedures of BTFS, BTFS may take such actions as it deems appropriate to discipline Representative, including levying monetary fines against Representative.

11.   Indemnification. The Representative, and each of its owners jointly and severally, if owned by more than one party, shall indemnify and hold harmless BTFS, its officers, directors, shareholders, parent corporations, affiliates, employees, agents and representatives from and against any and all liabilities and obligations of, or claims, complaints, investigations or examinations of any kind initiated or asserted against, BTFS, its officers, directors, shareholders, parent corporations, affiliates, employees, agents and representatives, arising from or related to the Representative's business, including but not limited to any and all types of transactions in securities; and from any unpaid debit balance by a customer of the Representative to the extent that such becomes unsecured, and unpaid by the customer when due by BTFS and/or its clearing firm; and from any and all actions, suits, proceedings, demands, assessments, settlements, judgments, costs and expenses, including attorneys' fees, incident to the foregoing. In order to secure the Representative's indemnity obligations identified in this paragraph, BTFS shall have the right to offset any such prospective or potential debits, liabilities or obligations against any personal or affiliated accounts of the Representative or against any commissions or compensation as consistent herewith. Upon the Representative's termination with BTFS, voluntary or otherwise, BTFS shall have the right to withhold any commissions or compensation due to the Representative until such time as all liabilities and obligations of the Representative hereunder are resolved.

12.   Right to Examine Books and Records. BTFS shall have the right from time to time to examine Representative's books, records, documents, computer files and any other files and may request copies of any or all such materials as are necessary to determine compliance with policies and procedures of BTFS or any regulatory agency or organizations.

13.   Right to Enter Premises.  Representative hereby grants to BTFS, its officers, directors, employees and agents, an irrevocable license to enter, including the continuing right and authority to enter, with or without notice, at any time during customary business hours (defined as 8 a.m. to 5:30 p.m. local time) and from time to time, any premises in which Representative conducts any business contemplated hereunder or maintains any information or records pertaining to any business contemplated hereunder and to take custody of any information or records relating to any business of Representative contemplated hereunder including any electronically stored records, databases computer disks, files and hard drives.

14.   Entire Agreement.  This Agreement contained the entire understanding between the parties hereto with respect to the subject matter hereof, and supercedes any prior agreements or understandings between them.  This Agreement may not be modified except by a written agreement signed by all parties hereto.

15.   Waiver of Breach.  No delay or omission on the part of BTFS in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy.  The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by said party.

16.   Assignment.  The rights and obligations of all parties hereunder shall inure to the benefit of and be binding upon each party's successors, heirs, personal or legal representatives and permitted assigns.  Representative may not assign, pledge or encumber in any way all or any part of his interest under this Agreement without the prior written consent of BTFS.  BTFS and its affiliates may assign their right under this Agreement to any H&R Block, Inc. direct or indirect subsidiary, or to any entity which may acquire all or substantially all or substantially all of the assets and business of BTFS or its affiliates.

17.   Severability.  The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision.

18.   Governing Law.  This Agreement shall be governed in all respect by the laws of the State of Missouri.

19.   Notices.  All notices required or permitted hereunder shall be in writing and shall be deemed to have been given and received three days after being mailed to the last known business address of the parties.

20.   Attorneys' Fees.  In the event either party deems it necessary to initiate legal action against the other to enforce any provision of this Agreement, the prevailing party may recover its costs incurred in initiating, defending and/or enforcing any provisions hereof, including, without limitation, reasonable attorneys' fees, investigative feeds, arbitration and court costs.

21.   Consent to Credit Review.  Representative authorizes BTFS to request and receive a credit background check on Representative through TRW or a similar service.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BIRCHTREE FINANCIAL SERVICES, INC.

By: _____

Title: _____Vice President_____

REPRESENTATIVE

_Mary Ellen Murphy_

Page 6 of 7

## SCHEDULE A
(Franchise Owner / General Manager)

### Payout Schedule

| Range | Payout |
|---|---|
| 0 – 5,000 | 50% |
| 5,001 – 15,000 | 55% |
| 15,001 – 25,000 | 60% |
| 25,001 – 45,000 | 65% |
| 45,001 – 75,000 | 70% |
| 75,001 – 100,000 | 75% |
| 100,001 – 140,000 | 80% |
| 140,001 – 190,000 | 82% |
| 190,001 – 240,000 | 84% |
| 240,001 and above | 86% |

Note:
- For the purposes of determining the payout percentage for any particular month, the aggregate gross commission production for the twelve months previous to the month in question is applied to the payout schedule above.
- The payout schedule applies to commissions derived from sales of all products.
- The parties understand that the payout schedule may be amended from time to time at the sole discretion of BTFS.



Photo: D. B. Kay

:s with vocal artists Robert
the Harrell Theatre's upcom-
ow is based on the music of
theatrical pop concert with
ings in the lead. The show
arch 2.

---

# s Council
# *try* musical

irch 2. The shows are Friday
l Saturday evenings at 8 p.m.
l Sundayb afternoons at 2:30
n. Tickets are $10 for adults
l $8 for children, students, and
nior citizens. For group rates or
more information, call the
irrell Theatre box office at 853-
28.

---

# ries

**James Cletis Taylor**, 79, of
bley, Miss., died on Jan. 26 at
residence. Mr. Taylor was a
ired school bus driver and
mer, an active member of
manuel Holiness Church,
ved in the Navy and was a
eran of World War II. He is
rvived by his daughter,
irley Hodum of Collierville;
son, J. Eugene Taylor of
bley; two sisters: Inez Box of
ie Mountain, Miss., and Jan
iebschman of Ripley; a
other, Gerald Taylor of
bley; two grandchildren:
iarles Taylor Hodum of
llierville and Pam Hakim of
ford; and three great grand-
ldren.



ESULTS!

your ad today!

---

of stu  s are graduating
from undergraduate programs
with overwhelming debts of
$20,000 to $30,000 or more.

The good news is that pri-
vate scholarship and grant
money has been increasing.
Currently there are more than
600,000 independent and pri-

i.com and ente  "Schol-
arship Information" in the sub-
ject line. The publication will
automatically be sent.

Those without computer
access can send $2.00 to cover
handling to NAFA, 188
Summer St., Dept. 13,
Portsmouth, N. H. 03801.

---

# MURPHY TAX SERVICES

### Electronic filing
### "Onsite Tax Services for Individuals and Business"

358 New Byhalia Road Suite 2
Collierville, Tennessee 38107
853-8900 (Fax - 493-5212)

**Mary Ellen Murphy, EA**

33 years experience

maryellenmurphy@aol.com

**Phillip A. Murphy**

www.ExecutiveTaxServices.com

PhillipAMurphy@aol.com



*Express Yourself!*
Create your own personalized Charm Bracelet with
**DynaFlex** Italian Modular links

Handmade in Italy of Stainless Steel and 18K Gold
Available in over 500 styles including initials,
colored stones and many enameled charm links.
Totally customizable to reflect your sense of style.

601-898-2210
256-757-4286

*Now available at:*
**The Shop Fine Jewelry and Repair**
747 W. Poplar, Suite 105
(In Collierville - located behind Bike World)

**EXHIBIT**

E - 1



# MURPHY INCOME TAX SERVICE

PHIL MURPHY   MARY MURPHY
358 New Byhalia Rd., Ste. 2
Collierville, TN 38017                    901-853-8900

## *YEAR-ROUND TAX SERVICE*

*for assistance with Estimates, Audits and Tax Questions.*

Prepared for:

☐ Federal   ☐ State   ☐ City



## Executive Tax Services

"Onsite tax services for individuals and business"

### Phillip A. Murphy

358 New Byhalia Rd Suite 2
Collierville, TN
(901) 493-5212
(901) 853-8900 fax

**EXHIBIT**

tabbies

*E -2*

Dear Friend:

Thank you for having us prepare your income tax return.

It was a pleasure to serve you and we are honored that you trusted us with this important task. Your return was carefully prepared by a professional preparer and you can be assured that all information from your return will remain confidential.

We have worked hard over the years to merit trust and confidence, and spend many hours between April 15th and December 31st keeping abreast of all tax changes that could be beneficial to your future income tax returns.

If you are satisfied with our service, please recommend us to a friend.

We look forward to serving you again next year. In the meantime, if you should have any questions regarding your income tax return, please call.

Very truly yours,

**YOUR TAX PREPARER**

_____

P.S. We recommend keeping a copy of all tax returns permanently.

It is important that you keep all supporting receipts and documents

used in preparing this year's return for at least four (4) years from its due date April 15. Should your return be selected for audit, these receipts and records could be required by the Internal Revenue Service or your state.

```
        H&R BLOCK #0679002
          :50 :. B HAL'A  n?
       COLLIERVILLE TN 38017
           901-853-9076
              Sale
ID: 0001           Ref #:   0005
03/14/03                 19:43:12
Batch #: 120
```

VISA

xxxxxxxxxxx5209

Appr Code: 006187   Inv#: 000005

Total:              $ 178.00

```
        Customer Copy
         THANK YOU!
```

RECEIPT

No. 0468501

DATE 3/14/03

RECEIVED FROM James Wright

○ FOR RENT
Ø FOR _Tax Prep_

| CASH | FROM |
| CHECK | |
| MONEY ORDER | |

| ACCOUNT | |
| PAYMENT | 178.00 |
| BAL. DUE | |

PAID
Executive Tax Services

$ 178.00

DOLLARS

TO

BY

1182

INTERNAL REVENUE SERVICE CENTER
MEMPHIS TN 37501-0002

[PLEASE PRINT]

1040, 1040A, 1040EZ

# EXECUTIVE TAX SERVICES

## 358 NEW BYHALIA RD STE 2A

## COLLIERVILLE, TN 38017-0000   (901) 853-8900

March 14, 2003                    Tax Year 2002

Dear JAMES D WRIGHT

Attached are copies of your completed federal and/or state
income tax return. You should retain copies of each return as
part of your permanent records. Please review your entire return
and call us at (901) 853-8900 if you have any questions.

Remember to also check the spelling of your name(s), your
address and your social security number(s). The information as
it appears on your tax return is as follows:

       *    JAMES D WRIGHT
       *                        — Information redacted
       *
           KILLEN, AL 35645     — information redacted

Your federal refund is      Please sign your return and mail
it to the following address:

Internal Revenue Service Center
MEMPHIS, TN  37501-0002

Your ALABAMA return shows a balance due of $1163. Please sign
your return and mail it to the following address:

Alabama Income Tax Division
P.O. Box 2401
Montgomery, AL  36140-0001

Your return was prepared this year by PHILLIP A MURPHY JR. We
sincerely hope you have been satisfied with our service and will
recommend us to a friend. We look forward to seeing you again in
2004.

As your tax preparer, we collect information provided by you
when preparing your taxes. This information can come from your
tax organizer, worksheets, documents and discussions. We are
required to keep this information confidential and to not
disclose it to third parties unless we have your approval or are
required/permitted to disclose it by law. We are committed to
the safe-keeping of your confidential information, and we
maintain physical, electronic and procedural safeguards to
protect your information.

Sincerely,

Department of the Treasury - Internal Revenue Service

**Form 1040 U.S. Individual Income Tax Return 2002** | (99) | IRS Use Only--Do not write or staple in this space.

For the year Jan. 1-Dec. 31, 2002, or other tax year beginning , 2002, ending , 20 | OMB No. 1545-0074

**Label**

Your first name and initial: JAMES D

Last name: WRIGHT

Your social security number: REDACTED

Use the IRS label. Otherwise, please print or type.

REDACTED

Apt. no.

▲ **IMPORTANT!** ▲
You **must** enter your SSN(s) above.

**Presidential Election Campaign**

Note: Checking "Yes" will not change your tax or reduce your refund.

Do you, or your spouse if filling a joint return, want $3 to go to this fund? . . . . . . . . ▶

You: ☐ Yes ☐ No   Spouse: ☐ Yes ☐ No

**Filing Status**

Check only one box.

1 ☒ Single

2 ☐ Married filing jointly (even if only one had income)

3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶

4 ☐ Head of household (with qualifying person). If the qualifying person is a child but not your dependent, enter the child's name here. ▶

5 ☐ Qualifying widow(er) with dependent child (year spouse died ▶ ).

**Exemptions**

6a ☒ **Yourself.** If your parent (or someone else) can claim you as a dependent on his or her tax return, **do not** check box 6a . . . . . . . . . .

b ☐ **Spouse**

c **Dependents:**

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) X if qualifying child for child tax credit |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than five dependents, see instructions.

No. of boxes checked on 6a and 6b: 1

No. of your children on 6c who:
● lived with you: 0
● did not live with you due to divorce or separation (see page 20): 0

Dependents on 6c not entered above: 0

d **Total number of exemptions claimed** . . . . . . . . . . . . . .

Add numbers on lines above ▶ [ 1 ]

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not staple, any payment. Also, please use Form 1040-V.

7 Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . | 7

8a Taxable interest. Attach Schedule B if required . . . . . . . . | 8a

b Tax-exempt interest. **Do not** include on line 8a . . . . . | 8b |

9 Ordinary dividends. Attach Schedule B if required. . . . . . . | 9

10 Taxable refunds, credits, or offsets of state and local income taxes | 10

11 Alimony received . . . . . . . . . . . . . . . . . . . | 11

12 Business income or (loss). Attach Schedule C or C-EZ . . . . . . | 12

13 Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13

14 Other gains or (losses). Attach Form 4797 . . . . . . . . . | 14

15a IRA distributions . | 15a | *Redacted* | b Taxable amount . | 15b

16a Pensions and annuities | 16a | | b Taxable amount . | 16b

17 Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E . . . . . | 17

18 Farm income or (loss). Attach Schedule F. . . . . . . . . . | 18

19 Unemployment compensation . . . . . . . . . . . . | 19

20a Social security benefits . . | 20a | *Redacted* | b Taxable amount . | 20b

21 Other income. List type and amount . . . . . . . . . . . | 21

22 Add the amounts in the far right column for lines 7 through 21. This is your **total income** . . . . ▶ | 22

**Adjusted Gross Income**

23 Educator expenses . . . . . . . . . . . . . | 23

24 IRA deduction . . . . . . . . . . . . . . . | 24

25 Student loan interest deduction . . . . . . . . . | 25

26 Tuition and fees deduction . . . . . . . . . . . | 26

27 Archer MSA deduction. Attach Form 8853 . . . . . . | 27

28 Moving expenses. Attach Form 3903 . . . . . . . . | 28

29 One-half of self-employment tax. Attach Schedule SE . . . . | 29

30 Self-employed health insurance deduction . . . . . . | 30

31 Self-employed SEP, SIMPLE, and qualified plans . . . . | 31

32 Penalty on early withdrawal of savings . . . . . . . | 32

33a Alimony paid  b Recipient's SSN ▶ | 33a

34 Add lines 23 through 33a . . . . . . . . . . . . . . . . | 34

35 Subtract line 34 from line 22. This is your **adjusted gross income** . . . . . . . . . . . ▶ | 35

JTA

For Disclosure, Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Form **1040** (2002)

Form 1040 (2002)   JAMES D WRIGH                                           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        Page **2**

| | | | |
|---|---|---|---|
| **Tax and Credits** | 36 | Amount from line 35 (adjusted gross income) . . . . . . . . . . . . . | **36** |
| | 37a | Check if: ☒ **You** were 65 or older, ☐ Blind; ☐ **Spouse** was 65 or older, ☐ Blind. | |
| | | Add the number of boxes checked above and enter the total here . . . . . . . . . . ▶ **37a** | 1 |
| | b | If you are married filing separately and your spouse itemizes deductions or you were a dual-status alien, check here . . . . . . . . . . . . . . . . ▶ **37b** ☐ | |

**Standard Deduction for-**
• People who checked any box on line 37a or 37b or who can be claimed as a dependent, see instr.
• All others:
Single: $4,700
Head of household: $6,900
Married filing jointly or Qualifying widow(er): $7,850
Married filing separately: $3,925

| | | |
|---|---|---|
| 38 | **Itemized deductions** (from Schedule A) **or your standard deduction** (see left margin) . . . . . . . | **38** |
| 39 | Subtract line 38 from line 36 . . . . . . . . . . . . . . . . . . . . . . . | **39** |
| 40 | If line 36 is $103,000 or less, multiply $3,000 by the total number of exemptions claimed on line 6d. If line 36 is over $103,000 see the worksheet in the instructions . . . . . . . . | **40** |
| 41 | **Taxable income.** Subtract line 40 from line 39. If line 40 is more than line 39, enter -0- . . . . | **41** |
| 42 | **Tax.** Check if any tax is from: a ☐ Form(s) 8814  b ☐ Form 4972 . . . . . . . | **42** |
| 43 | **Alternative minimum tax.** Attach Form 6251 . . . . . . . . . . . . . . . | **43** |
| 44 | Add lines 42 and 43 . . . . . . . . . . . . . . . . . . . . . . . . ▶ | **44** |
| 45 | Foreign tax credit. Attach Form 1116 if required . . . . . . . . . | **45** |
| 46 | Credit for child and dependent care expenses. Attach Form 2441 . . . . . . | **46** |
| 47 | Credit for the elderly or the disabled. Attach Schedule R . . . . . . . . | **47** |
| 48 | Education credits. Attach Form 8863 . . . . . . . . . . . | **48** |
| 49 | Retirement savings contributions credit. Attach Form 8880 . . . . . . . . | **49** |
| 50 | Child tax credit . . . . . . . . . . . . . . . . . . . | **50** |
| 51 | Adoption credit. Attach Form 8839 . . . . . . . . . . . . . | **51** |
| 52 | Credits from:  a ☐ Form 8396  b ☐ Form 8859 | **52** |
| 53 | Other Credits. Check applicable box(es):  a ☐ Form 3800 | |
| | b ☐ Form 8801  c ☐ Specify _____ | **53** |
| 54 | Add lines 45 through 53. These are your **total credits** . . . . . . . . . . . | **54** |
| 55 | Subtract line 54 from line 44. If line 54 is more than line 44, enter -0- . . . . . . ▶ | **55** |

| | | | |
|---|---|---|---|
| **Other Taxes** | 56 | Self-employment tax. Attach Schedule SE . . . . . . . . . . . . . . . . . | **56** |
| | 57 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 . . . . | **57** |
| | 58 | Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach Form 5329 if required . . . . | **58** |
| | 59 | Advance earned income credit payments from Form(s) W-2 . . . . . . . . . . | **59** |
| | 60 | Household employment taxes. Attach Schedule H . . . . . . . . . . . . . | **60** |
| | 61 | Add lines 55 through 60. This is your **total tax** . . . . . . . . . . . . ▶ | **61** |

| | | | |
|---|---|---|---|
| **Payments** | 62 | Federal income tax withheld from Forms W-2 and 1099 | **62** |
| | 63 | 2002 estimated tax payments and amount applied from 2001 return . . . . | **63** |
| If you have a qualifying child, attach Schedule EIC. | 64 | **Earned income credit (EIC)** . . . . . . . . . . . . . . | **64** 0 |
| | 65 | Excess social security and tier 1 RRTA tax withheld . . . . . . . . . | **65** |
| | 66 | Additional child tax credit. Attach Form 8812 . . . . . . . . . . | **66** |
| | 67 | Amount paid with request for extension to file . . . . . . . . . | **67** |
| | 68 | Other payments from:  a ☐ Form 2439  b ☐ Form 4136  c ☐ Form 8885 | **68** |
| | 69 | Add lines 62 through 68. These are your **total payments** . . . . . . . . . . . . ▶ | **69** |

| | | | |
|---|---|---|---|
| **Refund** | 70 | If line 69 is more than line 61, subtract line 61 from line 69. This is the amount you **overpaid** | **70** |
| Direct deposit? See instructions and fill in 71b, 71c, and 71d. | 71a | Amount of line 70 you want **refunded to you.** . . . . . . . . . . . . . . ▶ | **71a** |
| | ▶ b | Routing number _____  ▶ c Type: ☐ Checking  ☐ Savings | |
| | ▶ d | Account number _____ | |
| | 72 | Amount of line 70 you want **applied to your 2003 estimated tax** . . . . ▶ | **72** |

| | | | |
|---|---|---|---|
| **Amount You Owe** | 73 | **Amount you owe.** Subtract line 69 from line 61. For details on how to pay, see instr . . . . . . . ▶ | **73** |
| | 74 | Estimated tax penalty . . . . . . . . . . . . . . . . . . | **74** |

| | |
|---|---|
| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see instr)? ☐**Yes.** Complete the following. ☐ **No** |
| | Designee's name ▶ _____  Phone no. ▶ _____  Personal identification number (PIN) ▶ _____ |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

| Your signature | Date | Your occupation | Daytime phone number |
|---|---|---|---|
| | | SONG WRITER | |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | |

| | | |
|---|---|---|
| **Paid Preparer's Use Only** | Preparer's signature ▶ [signature] | Date 3/14/2003   Check if self-employed ☐   Preparer's SSN or PTIN P00128635 |
| | Firm's name ( or yours if self-employed ), address, and ZIP code ▶ | EXECUTIVE TAX SERVICES   EIN 75-2983518 |
| | | 358 NEW BYHALIA RD STE 2A |
| | | COLLIERVILLE      TN 38017-0000   Phone no. (901) 853-8900 |

JTA                                                                         Form **1040** (2002)



# Internal Revenue Service
DEPARTMENT OF THE TREASURY

The
Digital
Daily

## e-File Provider Search

### Authorized IRS *e-file* Providers

**Name of Business:** DANNY YOUNG CPA
**Address:** 905 SUGAR COVE
**City/State/Zip:** COLLIERVILLE, TN 38017
**Point of Contact:** DANNY YOUNG
**Telephone:** (901)854-2575
**Type of Service:** Electronic Return Originator

---

**Name of Business:** DIRECT GENERAL CONSUMER PRODUCTS
**Address:** 555 S CENTER ST
**City/State/Zip:** COLLIERVILLE, TN 38017
**Point of Contact:** SCOTT MCMASTER
**Telephone:** (901)854-5858
**Type of Service:** Electronic Return Originator

---

**Name of Business:** DOVE SYSTEMS
**Address:** 128 SUMMIT COVE
**City/State/Zip:** COLLIERVILLE, TN 38017
**Point of Contact:** DONALD O VICK
**Telephone:** (901)262-0586
**Type of Service:** Electronic Return Originator

---

**Name of Business:** ENGELKEN & ENGELKEN
**Address:** 201 S CENTER ST STE 100
**City/State/Zip:** COLLIERVILLE, TN 38017
**Point of Contact:** CHARLES T ENGELKEN
**Telephone:** (901)853-8502
**Type of Service:** Electronic Return Originator

---

**Name of Business:** FINANCIAL BUSINESS SOLUTIONS
**Address:** 610 W POPLAR
**City/State/Zip:** COLLIERVILLE, TN 38017
**Point of Contact:** MICHAEL C SISK
**Telephone:** (901)373-8818
**Type of Service:** Electronic Return Originator

---

**Name of Business:** H & R BLOCK
**Address:** 358 N BYHALIA ROAD, SUITE 1
**City/State/Zip:** COLLIERVILLE, TN 38017



EXHIBIT
F

> Point of Contact:  MARY E MURPHY
> Telephone:         (901)853-9076
> Type of Service:   Electronic Return Originator

---

Name of Business: INCOME TAX OFFICE GROUP
Address:          302 S CENTER ST
City/State/Zip:   COLLIERVILLE, TN 38017
Point of Contact: SADIE M PAYNE
Telephone:        (901)853-3732
Type of Service:  Electronic Return Originator

---

Name of Business: J & W TAX SERVICE INC
Address:          567 W POPLAR AVE STE 1
City/State/Zip:   COLLIERVILLE, TN 38017
Point of Contact: JO ANN M WILDER
Telephone:        (901)854-5505
Type of Service:  Electronic Return Originator

---

Name of Business: JACKSON HEWITT TAX SERVICES
Address:          3540 SUMMER STE 102
City/State/Zip:   MEMPHIS, TN 38017
Point of Contact: CATHY BASENESE
Telephone:        (973)496-2678
Type of Service:  Electronic Return Originator

---

Name of Business: JAMES M LAVENDER CPA
Address:          340 NEW BYHALIA RD STE 4A
City/State/Zip:   COLLIERVILLE, TN 38017
Point of Contact: JAMES M LAVENDER
Telephone:        (901)854-1324
Type of Service:  Electronic Return Originator

---

> Name of Business: MARY ELLEN MURPHY
> Address:          358 NEW BYHALIA RD
> City/State/Zip:   COLLIERVILLE, TN 38017
> Point of Contact: MARY E MURPHY
> Telephone:        (901)853-9076
> Type of Service:  Electronic Return Originator

---

> Name of Business: MURPHY TAX ASSOCIATES LLC
> Address:          358 NEW BYHALIA ROAD
> City/State/Zip:   COLLIERVILLE, TN 38017
> Point of Contact: MARY E MURPHY
> Telephone:        (901)853-9076
> Type of Service:  Electronic Return Originator

---

> Name of Business: PHILLIP A MURPHY JR
> Address:          358 NEW BYHALIA RD STE 2A
> City/State/Zip:   COLLIERVILLE, TN 38017

Point of Contact:     PHILLIP A MURPHY JR
Telephone:            (901)493-5212
Type of Service:      Electronic Return Originator

———————

Name of Business: SIDNEY R BEACH CPA
Address:              485 E SOUTH STREET #108
City/State/Zip:       COLLIERVILLE, TN 38017
Point of Contact:     SIDNEY R BEACH
Telephone:            (901)854-1040
Type of Service:      Electronic Return Originator

———————

Name of Business: TAYLOR & ASSOCIATES
Address:              9240 HOLMES RD
City/State/Zip:       COLLIERVILLE, TN 38017
Point of Contact:     ELVIRA TAYLOR
Telephone:            (901)624-1292
Type of Service:      Electronic Return Originator

———————

Name of Business: WATKINS TAX SERVICE
Address:              140 HWY 72
City/State/Zip:       COLLIERVILLE, TN 38017
Point of Contact:     CHESTER WATKINS
Telephone:            (901)853-3732
Type of Service:      Electronic Return Originator

———————

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET 0 ✒ 2763 Ma P

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as requi law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

H&R Block Eastern Tax Services, Inc.

**(b)** County of Residence of First Listed Plaintiff    Jackson, MO
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Steven W. Likens
Husch & Eppenberger, LLC
200 Jefferson Ave., Ste 1450
Memphis, TN 38103; (901) 523-1123

## DEFENDANTS

Phillip Murphy, Mary E. Murphy, Phillip Murphy, Jr., & Murphy Tax Associates, LLC
County of Residence of First Listed    Shelby, TN
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)
Kenneth A. Rutherford
Rutherford Center, P.O. Box 1381
Oxford, MS 38655; (615) 513-3901

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defenda
(For Diversity Cases Only)

|  | PLF | DEF |  | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business in Another State | | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionmen |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rate |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organization |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☒☒ 840 Trademark | ☐ 850 Securities/Commodit. |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilizat |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matter |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Ac |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | or Defendant) | Determination Under |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS—Third Party | Equal Access to Justi |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | State Statutes |
| | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Action |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to D Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Trademark Infringement, 5 U.S.C. § 1125

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____  DOCKET NUMBER _____

DATE  10/16/03

SIGNATURE OF ATTORNEY OF RECORD  *Steve W. Likens*

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____